*In re* MARRIAGE OF JOHN BRUCE NEELD, JR., Petitioner-Appellee, and MARGARET ELISE MOSS NEELD, Respondent-Appellant.

Fifth District    No. 80-338

Opinion filed April 28, 1981.

Mitchell, Brandon & Schmidt, of Carbondale, for appellant.

Mark J. Kadish and Rhonda A. Brofman, both of Kadish, Davis & Brofman, of Atlanta, Georgia, and Eugene Menges, of Belleville, for appellee.

Mr. JUSTICE WELCH delivered the opinion of the court:

Dr. John Bruce Neeld, Jr. (John), and Dr. Margaret Elise Moss Neeld (Elise), were divorced in Georgia in 1972. Pursuant to an agreement, the decree granted custody of their only child, three-year-old David, to Elise, with appropriate visitation rights for John. In 1978, John instituted this action in the Circuit Court of Franklin County, the home of Elise and David, to modify that decree. In an order entered on June 18, 1980, the trial court granted John permanent custody of David, and Elise appeals from that order. She argues (1) that the order was not sufficiently specific to satisfy section 610(b) of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 610(b)), and (2) that the order was contrary to the evidence introduced at trial.

■■ A trial court may not modify a prior custody judgment "unless it finds, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interest of the child." The changed circumstances alleged by John have to do with Elise's abuse of alcohol and drugs. A review of these incidents of purported alcohol and drug abuse is necessary to resolve this case.

Following the divorce in 1972, Elise and David lived in Memphis, Tennessee, where she completed her post-graduate medical training. They moved to St. Louis, Missouri, in July 1974. Several of the occurrences discussed at trial took place during their stay in St. Louis.

Two fires took place in the Elise Neeld home during this period. On New Year's Eve, 1975, Elise fell asleep on a couch in her living room after having some alcohol earlier in the evening. David was asleep upstairs. Elise awoke to discover that the couch was on fire, probably due to the explosion of a butane lighter which she had left near the couch. While neighbors called the fire department, David left the apartment and Elise attempted to extinguish the burning couch. She suffered minor burns and David was unhurt.

A later fire was accidentally started by David, who was playing with matches in the basement. Elise was upstairs watching a football game that Sunday morning, and had not been drinking that day. Elise and David left the apartment safely and neither was injured in this fire.

On January 31, 1976, Elise was charged with driving while impaired. David was riding in the back seat of the car when Elise's car was stopped by police. Elise had a blood alcohol level of .19%. (.10% is the maximum legal limit in Missouri), and she admitted that she had in fact been drinking at a friend's home before she attempted to drive home. The officer who stopped the car transported Elise and David to their apartment. As an incident of this charge, Elise was directed to attend a class referred to as the "alcohol related traffic offense program," which she completed.

In October of the same year, Elise drove to a service station with David and several bags of groceries in the car. The attendant noticed that Elise was not fully coherent, and he called the police. The officer would not allow Elise to drive, so he brought Elise, David, and their groceries home, and told her to retrieve her car the next day. Elise was not cited as a result of this incident.

During her stay in St. Louis, Elise was acquainted with Martha Field, with whom she worked at the St. Louis County Hospital. In a deposition, admitted into evidence, Ms. Field noted that there had been other occasions when she had been concerned about Elise's ability to drive home safely with David. She also recalled that Elise occasionally "appeared somewhat erratic" at work, though this may have been due to lack of sleep.

According to Ms. Field, Elise would "frequently" call her at home during the evenings, and the women would chat. Often, Elise's speech would become slurred and her conversation would become rambling and incoherent. Ms. Field would, if she had something else to do, hand the telephone to one of her children, and when she would return several minutes later, Elise's conversation would have continued as though Ms. Field had not left the phone.

As confirmed by both women, Elise wrote several valium prescriptions for Ms. Field, who requested them. Elise stated that she would write

the prescriptions for twice the amount requested, and when Ms. Field had them filled, they would divide the valium. Elise stated that she preferred to have Ms. Field obtain the valium for her in order to obtain the privacy which would not have accompanied a prescription filled in her own name at St. Louis County Hospital.

Ms. Field stated that Elise was a "heavy" drinker when she knew her in St. Louis. Elise admitted that she drank regularly, but said that she drank to excess only infrequently. She did, however, concede that on occasion, she fell asleep in her living room while David was watching television or doing his homework. She did not wake up, sometimes until 3 or 4 o'clock the next morning, to find that David had either put himself to bed or that he had fallen asleep with the television on. Elise did drink before most of these occurrences, but she said that she probably fell asleep because she was exhausted after a day at work.

Elise left St. Louis in the summer of 1978 to occupy a vacant position in radiology at the Franklin County Hospital in Benton, Illinois. To facilitate the move, David stayed with John and his second wife, Gail, for a longer period than that specified in the custody agreement. Elise made arrangements for the movers to load her belongings into a van on June 23, 1978. Due to rain, the movers ran far behind schedule and for several hours could accomplish nothing. While they remained outside in their van, Elise drank several vodka drinks. She also took valium that day.

When the movers resumed work in the midafternoon, they noticed that Elise was having difficulty walking and that she was somewhat incoherent. They called for medical assistance, and an ambulance was dispatched to transport her to the Missouri Baptist Hospital. Emergency room personnel diagnosed her as the victim of an "overdose," though it is uncertain whether they meant drugs or alcohol. Elise signed herself out of the hospital against medical advice approximately one hour after she had been admitted, so that she could resume packing.

Elise moved to Benton as intended. In late June or early July, she called a plumber to do some work at her house. The plumbers arrived to find her unsteady on her feet due to what appeared to them to be intoxication. She attempted to assist the plumbers, but only interfered with their work. When Elise fell between her dryer and the back door to her house, the plumbers took her to the kitchen, where they sat her down so that they could finish the job. David was still in Atlanta with his father when this incident occurred.

On December 4, 1978, Elise had an afternoon off work, which she spent at home. She had several drinks before she received a call from Franklin County Hospital informing her that Dr. William Swinney wanted her to read some X rays for him. Elise returned to the hospital, read the X rays and called Dr. Swinney to give him her report. To Dr.

Swinney, Elise's speech seemed slurred and she talked longer than she would usually talk when making a report to him. Dr. Swinney notified the hospital administrator that Elise may have been working while intoxicated and he requested the administrator to investigate the matter.

Another evening that month, Elise and David decided to carry out a pizza for dinner. It was a rainy night, and she had had something to drink before she drove with David to pick up the food. On the way to the restaurant, Elise swerved her car in such a way that it ended up, the passenger's side on the ground, in a ditch next to the road. When the police came, David exited the car through the driver's door, but Elise had to be assisted from the vehicle because she appeared to be under the influence of drugs or alcohol. David and Elise were driven home by a neighbor, even though the car was functional. Neither of them was injured in this accident.

Later that December, the hospital's executive committee met to consider Dr. Swinney's complaint. It was decided that Elise should take a leave of absence to seek treatment for her problems. She arranged to visit the Mayo Clinic as an in-patient in the alcohol and drug dependency unit. She did not inform David or John where she was going but instead sent David to Georgia for his Christmas vacation, as planned. When John became suspicious about Elise's arrangements during the holiday season, he called an acquaintance at the Franklin Hospital and discovered that she had in fact gone to Minnesota for treatment for alcoholism. John filed the present action on December 29, 1978. Until a permanent decision could be made, John sought temporary custody of David and a hearing was set for Elise's return to Benton.

At Mayo's, Elise was diagnosed as an alcoholic, and she agreed with the diagnosis. She remained at the clinic for approximately five weeks and participated in all of the programs. A psychiatrist who was involved in Elise's treatment noted that of the typical patient treated at Mayo's "about 66% do quite well, defining 'quite well' as being either completely abstaining or marked improvement, with maybe a couple of brief relapses into alcoholic drinking." He testified that physicians normally do somewhat better than the average patient, but that the possible success of any particular patient would be very difficult to predict. The psychiatrist also stated that, according to hospital records as well as according to his own recollection, Elise never mentioned her use of valium to the Mayo staff. Elise testified to the same effect. This would be a material omission in the facts needed for treatment and would adversely affect any patient's chances for recovery.

A hearing on David's temporary custody was held in February 1979. David had not returned from Georgia in January, but had, at his father's arrangement, entered school there. At the conclusion of that hearing, at

which most of the evidence discussed above was introduced, the trial court orally found

> "* * * that it is in the best interests of the child, [David] Bruce Neeld, that the child remain in the custody of his natural father; that as of this date, the conditions of his natural mother's health, mental and physical, and recent past conditions surrounding the child's living with her, does now cause great concern to this court as to the well-being of [David] Bruce, both physical and mental. The court, therefore, does determine that the best interests of the child, [David] Bruce, would be better served by the child remaining in the custody of his natural father, pending a final order on the petition for modification filed in this cause."

A written order to the same effect was entered later that month.

The final hearing in this case was held in October 1979. The evidence at this hearing was a detailed version of the evidence presented in February. It was shown that Elise had participated in several follow-up meetings since her discharge from Mayo's and that she had alcoholic drinks on only two occasions since then. Both instances were described by Elise as "experiments," to test her reaction to alcohol. The first time, she fixed herself a drink, but only had part of it and poured the rest out. The second time, she had two drinks and then stopped.

Elise was given a 30-day prescription of a drug called Antabuse, when she left Mayo's. This drug is designed to cause irritation to the digestive system when alcohol is ingested. She took half of the Antabuse and then discontinued it. No testimony was introduced to show that Elise had abused alcohol or valium since her treatment at Mayo's.

Written briefs were submitted to the trial court in February 1980, and the trial court entered judgment in June of that year. In the judgment order, the court stated that

> "The court having considered the relevant factors set forth in Section 602, Chapter 40, IRS 1979, and the court having found that there has been a substantial change in the circumstances of Margaret Elise Moss Neeld since the entry of the Georgia decree, it is further ordered and adjudged, with the best interests of the parties [sic] minor child, David, considered, that the Georgia decree is modified to place permanent custody of David with the petitioner, John Bruce Neeld, Jr., his father."

Elise was given certain visitation rights.

The June 1980 order is first challenged by Elise as not sufficiently specific to satisfy section 610(b) of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 610(b)). Our attention is directed to *In re Custody of Harne* (1979), 77 Ill. 2d 414, 396 N.E.2d 499, which considered that section. It provides that:

"(b) The court shall not modify a prior custody judgment unless it finds, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interest of the child. In applying these standards the court shall retain the custodian appointed pursuant to the prior judgment unless:

(1) the custodian agrees to the modification;

(2) the child has been integrated into the family of the petitioner with the consent of the custodian; or

(3) the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him." (Ill. Rev. Stat. 1979, ch. 40, par. 610(b).)

*Harne* held that "[o]nly if the trial court sets forth explicit findings that subsection (1), (2) or (3) applies, can the appellate courts intelligently review trial court judgments and the exercise of such trial court discretion as remains in this area." (77 Ill. 2d 414, 421, 396 N.E.2d 499, 502.) According to *Harne*, those explicit findings are a jurisdictional prerequisite to a custody modification order.

The trial court in *Harne* did not "articulate the necessary finding at the conclusion of the hearing when he orally granted the petition for change of custody." (77 Ill. 2d 419, 421, 396 N.E.2d 499, 502.) He did make that finding in a final written order as well as in response to a motion for reconsideration. This was considered sufficient to satisfy section 610(b).

In this case, the only pertinent dispositional orders are the oral and written orders of February 1979 granting temporary custody of David to John and the written order of June 1980 granting him permanent custody of the child. The February 1979 orders specifically mention the possible harm to David's physical and mental health were he to remain with Elise, as referred to in section 610(b)(3). The written order of June 1980 discusses only "a substantial change in the circumstances of Margaret Elise Moss Neeld" and "the best interests of the child." The question first posed by Elise, then, is whether the lack of specificity in the final order deprived the trial court of jurisdiction to modify the Georgia decree.

■■ We first note that *Harne* held that "section 610(b) requires a trial judge to make explicit findings that either subsection (1), (2) or (3) is applicable prior to modifying a custody judgment." (77 Ill. 2d 419, 421, 396 N.E.2d 499, 502.) It did not require that those findings be present in the final judgment order. Therefore, strictly speaking, the trial court did

make the appropriate findings prior to that modification, whether one considers the temporary order or the permanent order as the trial court's modification of the custody judgment. See also *In re Custody of Yuhas* (1980), 87 Ill. App. 3d 521, 409 N.E.2d 148.

Moreover, an important reason that the *Harne* court established this requirement was that "absent such a judicial finding, a court of review would be unable to determine the basis for a modification order and would be left to speculate on the grounds relied upon by the trial judge." (77 Ill. 2d 419, 421, 396 N.E.2d 499, 502.) No such speculation is required in this case, for the February 1979 orders make it obvious that the decisions of the trial court are based upon section 610(b)(3). Consequently, we hold that the record in this case contains explicit findings as required by *Harne* and that the trial court had jurisdiction to modify the Georgia custody judgment.

Finally, Elise challenges the trial court's decision as not based upon the evidence introduced at trial. John suggests that the order be upheld under the authority *Doyle v. Doyle* (1978), 62 Ill. App. 3d 786, 379 N.E.2d 387. Although *Doyle* held that explicit findings were not required under section 610(b), and was thus overruled by *Harne* on that issue, it is nonetheless factually similar to the present case.

In *Doyle*, the mother was initially granted custody of the two children. She "had a seizure or a blackout related to her heavy consumption of alcohol" in December 1976 and was hospitalized. Soon after this incident, the father was awarded temporary custody of the children, who remained with him until a hearing on permanent custody in November 1977. The trial court awarded the father permanent custody of the children, and this decision was affirmed on appeal. The appellate court stated that:

> "Upon her release from the hospital on December 10, 1976, plaintiff [the mother] voluntarily entered the residential facility of Project Lighthouse, the McLean County Alcohol and Drug Assistance Unit. Following her discharge from the unit on February 9, 1977, she participated in an 'after-care plan' and maintained formal and informal contact with the unit and Alcoholics Anonymous. The evidence presented at trial showed that plaintiff had made very good progress in eliminating her abuse of alcohol and that her ability to function and cope with stress had greatly improved. However, when the children were taken from her earlier she had often been intoxicated and unable to care for the children and unable to properly relate to them. [The Doyle children, like David Neeld, preferred to live with their father and stepmother instead of their mother.] There was no assurance that plaintiff's abuse of alcohol would not recur nor that her inability to relate to the

children would not continue. The court could conclude that to allow the children to live with their mother would severely endanger their physical and emotional health." 62 Ill. App. 3d 786, 790, 379 N.E.2d 387, 390.

■■ We believe that the reasons for transferring the custody of David to his father are much stronger than those which supported the decision in *Doyle*. Here, Elise's involvement with alcohol resulted in numerous incidents which were viewed by third parties. That involvement was serious enough to impair her ability to function as a physician and more importantly, to endanger the life of David, who was at times a passenger in her car when she was intoxicated.

Furthermore, Elise had abused valium by taking it in combination with alcohol on at least one occasion, and she did not inform the treating physicians that she had ever done so. Although the record in this case shows that Elise had made substantial progress in treating the effects of her alcoholism, her abuse of alcohol and drugs was quite pronounced. As the appellate court noted in *Doyle*, we are far from assured that she will not fall back into those habits which posed such a threat to herself and to David. Thus, it cannot be said that the trial court's decision to transfer David's custody to John was contrary to the manifest weight of the evidence. The judgment of the Circuit Court of Franklin County is therefore affirmed in its entirety.

Affirmed.

KASSERMAN, P. J., and JONES, J., concur.