TRACEY NAYLOR, Plaintiff-Appellant, v. RANDAL KINDRED, Defendant-Appellee.

Fourth District    No. 4—92—0411

Argued January 13, 1993.—Opinion filed September 9, 1993.

James W. Ackerman (argued), of Springfield, for appellant.

Richard D. Frazier (argued) and Frederick J. Schlosser, both of Metnick, Barewin, Wise & Cherry, of Springfield, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Tracey Naylor appeals the decision of the circuit court of Logan County granting the motion of Randal Kindred (Randy) for modification of custody of their minor child, Cassandra. Tracey alleges the trial court erred in modifying custody in the absence of a showing of serious endangerment. We disagree and affirm.

## I. FACTS

Tracey and Randy began dating in late December 1988. A few weeks later, the second or third week of January 1989, Tracey told Randy she was pregnant. On March 1, 1989, Tracey and Randy began living together, along with Tracey's two other children. They broke up and moved apart the following month. Randy was not certain whether the child Tracey was carrying was his, and did not maintain contact with Tracey during her pregnancy. The baby, Cassandra Naylor, was born in September 1989. In January 1990, Tracey contacted Randy, told him the baby was his, and stated she would like him to see Cassandra.

In 1989 and 1990, Tracey was a recipient of public aid. In October 1990, the Department of Public Aid (Department) filed a petition to have Randy adjudicated the father of Cassandra, ordered to support Cassandra, and ordered to reimburse the Department of Public Aid for monies it had expended in support of Cassandra. In December 1990, Randy and Tracey entered into an agreement to submit to blood tests. The blood tests revealed Randy was the father of Cassandra. On March 13, 1991, the court entered an order finding Randy was the father of Cassandra and ordering him to pay child support and reimburse the Department for sums expended for the support of Cassandra. On May 16, 1991, Randy and Tracey entered into an agreed order regarding Randy's visitation rights, and the court ordered Randy could claim Cassandra as a dependent for Federal income tax purposes.

In August or September 1991, Tracey moved to Georgia, where her sister lived, and married a man whom she had known for one month. Randy tried to discover Tracey's whereabouts to maintain contact with Cassandra, but her family would not provide him with her address or phone number. On December 6, 1991, Randy filed a petition for a rule to show cause, alleging Tracey had denied him his visitation rights by removing Cassandra from the State.

On December 20, 1991, Tracey was arrested. Tracey had been convicted of Federal welfare fraud several years earlier, and placed on probation. She violated her probation by leaving the State of Illinois without requesting permission of, or notifying, her probation officer. Beverly Parker, Tracey's sister who lived in Georgia, took care of Tracey's three children after Tracey's arrest. Tracey signed a statement purporting to grant temporary guardianship of her three children to Parker, and stating that in the event of her incarceration Tracey's mother, Jean Naylor, and sister, Penny Patton, were to have joint custody and guardianship of the children. In this document, Tracey stated under no circumstances was Randy to obtain custody of Cassandra.

On January 15, 1992, Tracey was sentenced to two years' incarceration, with credit for time served. Under the Federal sentencing guidelines in effect at the time, Tracey could receive good-time credit which, if earned, would permit her release in eight months. Cassandra and her half-brother and half-sister were cared for by Parker, and then were brought to Tracey's mother in Illinois. After Tracey was arrested, Tracey's husband went to Florida and was still there at the time of the custody hearing.

On February 13, 1992, Randy filed a petition for change of custody under the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (Ill. Rev. Stat. 1991, ch. 40, par. 610), alleging Tracey had denied his right to visitation, removed Cassandra from the State, been arrested, was incarcerated, and it would be in the best interests of Cassandra that he be granted custody. On March 27, 1992, Tracey filed a motion to remove Cassandra from Illinois, alleging she currently possessed legal and physical custody of Cassandra, although she was incarcerated, and it would be in Cassandra's best interest to be cared for by Tracey's sister in Georgia during her incarceration. Ill. Rev. Stat. 1991, ch. 40, par. 609.

On March 30, 1992, the court held a hearing on the petition for modification and petition for removal. At that time, Tracey was incarcerated in a Federal penitentiary in Texas. At the hearing, Randy acknowledged that he was a recovering alcoholic. After he and Tracey

broke up, he sought treatment for alcoholism and cannabis dependency. Randy testified he had not consumed any alcohol or used any controlled substances for three years. Randy testified he lives three miles from his parents and two miles from Jean. Randy additionally testified he thought it was important Cassandra remain in contact with Tracey and her family, and especially with her half-siblings. The testimony indicated Randy visited with Cassandra prior to the custody hearing and she was responsive to Randy and his parents.

Randy's parents testified if Randy was granted custody of Cassandra, they would assist Randy and care for Cassandra while he was at work. Randy's parents testified they would facilitate visitation between Cassandra and her mother and half-siblings. Randy's mother, Helen Kindred, testified she and her husband had established a relationship with Cassandra's half-siblings when Randy and Tracey had been living together. Cassandra's half-sister, Katy, called Randy's parents Grandma and Grandpa, and had spent the night at their house and gone to church with them.

Parker testified she had three children of her own and would care for Cassandra and Tracey's other children while Tracey was incarcerated. Parker testified Cassandra had established a good relationship with her children, and that Cassandra called Parker "mama," and her husband "Uncle LeeWee."

Jean Naylor, Tracey's mother, testified she had raised five children of her own and would care for Cassandra if Cassandra was not permitted to live in Georgia with Parker. Jean testified that she knew when Tracey went to Georgia that Tracey was violating the custody order granting Randy visitation, but she took no steps to ensure Randy could exercise his visitation rights because she did not feel it was her duty. Jean testified she was contacted by Randy's attorney and told him she did not have any idea where Tracey was. The attorney gave her his telephone number and asked her to call him when she found out where Tracey was. Jean testified she knew Tracey was moving to Moultrie, Georgia, but did not know her address. Jean additionally testified that Parker told her Tracey and her new husband were living in Moultrie, but Tracey, who was not on good terms with Jean, did not want Jean to know her address.

Donald Gottschalk, a clinical psychologist, testified he met Jean, Parker, Cassandra, and Cassandra's half-siblings. Gottschalk observed Cassandra interacting with her half-siblings in two 10- to 15-minute sessions, and administered a test to Cassandra during a 45-minute interview. As a result of the test, Gottschalk concluded Cassandra had a preference for a maternal parent figure and a strong identification

with her half-siblings. Gottschalk interviewed Jean for 45 minutes and Parker for one hour. Gottschalk also administered a test to Parker and determined she was free from any psychological disturbance or any problem that would prevent good parenting. Gottschalk testified it would be traumatic for Cassandra to be removed from her half-siblings. Gottschalk testified he determined Cassandra was ideally placed with Parker.

On cross-examination, Gottschalk testified his first contact with this family occurred when Jean called him and requested an estimate of how much his evaluation would cost. He gave her an estimate for doing an evaluation and writing up a report. Gottschalk testified there are three levels of examinations. The first level of examination involved evaluating the child. The second level is evaluating the child and one or both parents, and the third level is evaluating the child and seeing the child in both parents' homes. Gottschalk admitted he had not interviewed Randy, Parker's husband, or Parker's children. Gottschalk acknowledged a well-known psychologist had noted in his treatise it would be an ethical violation to draw *any* conclusions about which parent would be the better custodial parent unless one had assessed both parents. Gottschalk also acknowledged the same well-known psychologist stated, in his treatise, 16 hours should be the minimum amount of time for a study involving two parents and one child. However, Gottschalk stated this would be the minimum amount of time spent in a level three evaluation, and although a level three evaluation would have given him a better basis for his evaluation in this case, he does what he is hired to do.

In closing argument, Tracey's attorney for the first time alleged the proper standard in determining custody was not the best interests of the child standard alone, but the serious endangerment standard. Randy's attorney argued under the second district's decision in *In re Marriage of Oertel* (1991), 216 Ill. App. 3d 806, 576 N.E.2d 435, Randy need only establish a change in custody would be in Cassandra's best interests. The circuit court ruled serious endangerment need not be established, rather only changed circumstances, and found there had been clear and convincing evidence of a change in circumstances, and custody should be modified in favor of Randy. Specifically, the court found Tracey was legally incapacitated to care for Cassandra due to her incarceration, and there is a presumption in Illinois that a biological parent is entitled to custody of his or her child.

The court also found Randy was thwarted by Tracey in his attempts to visit Cassandra and active concealment by Tracey could justifiably be inferred. The court additionally found Randy's past prob-

lems with drugs and alcohol were somewhat stale and the evidence showed he had maturely addressed and hopefully cured those problems. The court found Randy sincerely wants custody of Cassandra, is employed, has accommodations for Cassandra, and will have help from his parents caring for her. A motion to reconsider was denied and the court ordered Cassandra remain in Randy's custody pending appeal. Tracey appeals, alleging the circuit court erroneously modified custody in the absence of a finding of serious endangerment. Notably, Tracey *has not* alleged the circuit court erred in determining changed circumstances had been established or it was in Cassandra's best interests to be placed with Randy.

The issue of whether there is an exception to the required showing of serious endangerment, due to a situation not contemplated by the legislature, involves a question of law. Thus, we review the circuit court's ruling under a *de novo* standard of review. (See, *e.g., Ranquist v. Stackler* (1977), 55 Ill. App. 3d 545, 550, 370 N.E.2d 1198, 1202.) Tracey's argument on appeal is essentially a "plain language" argument. Tracey argues because the plain language of the statute requires serious endangerment in order to modify custody orders within two years of their entry, the trial court erred in finding serious endangerment did not have to be established under the circumstances of this case. Randy argues the trial court correctly determined, under *Oertel*, Tracey's violation of Illinois law requiring leave of court prior to the removal of a child from the State constituted a forfeiture of her right to custody. Randy additionally argues the legislature did not contemplate the situation of an incarcerated custodial parent when enacting the requirement of a showing of serious endangerment in order to modify custody within two years. Randy contends there should be an exception to requiring proof of serious endangerment under the circumstances of this case.

## II. TIMING OF PETITION TO MODIFY

Randy was adjudicated the father of Cassandra and ordered to financially support her on March 13, 1991. On May 15, 1991, the court entered an agreed order regarding visitation and ordered Randy could claim Cassandra as a deduction for Federal income tax purposes. These orders did not provide for the custody of Cassandra, nor has there ever been an explicit judicial declaration of the custody rights of the parents. However, under Illinois law, if a judgment of parentage contains no explicit award of custody, the establishment of support obligations or of visitation rights in one parent shall be considered a judgment granting custody to the other parent. (Ill. Rev.

Stat. 1991, ch. 40, par. 2514(a)(2).) Since Randy's petition was filed on February 13, 1992, less than two years after the entry of the orders requiring him to pay support and granting him visitation, it is as a petition filed within two years of a custody order.

### III. REQUIREMENTS FOR MODIFICATION OF CUSTODY WITHIN TWO YEARS

■ The Illinois Parentage Act of 1984 provides modification of custody is governed by the Marriage Act. (Ill. Rev. Stat. 1991, ch. 40, par. 2516.) In the Marriage Act, the Illinois legislature has provided three requirements which must be met in a contested custody modification proceeding, before a custody order may be modified within two years of its entry. The petitioner must establish: (1) the child is seriously endangered in his or her present environment; (2) there have been changed circumstances warranting modification of the custody order; and (3) the proposed modification is in the best interests of the child. Ill. Rev. Stat. 1991, ch. 40, pars. 610(a), (b).

The limitation on custody modification within two years, absent serious endangerment, is a legislative attempt to provide stability and continuity in the child's life by preventing the "ping-pong" litigation of custody disputes, yet provide a "safety valve" for the modification of custody in emergency situations. (Ill. Ann. Stat., ch. 40, par. 610(a), Historical and Practice Notes, at 94 (1980).) The effect of section 610(a) of the Marriage Act is that even if the noncustodial parent would, perhaps, be a better parent for the child, custody will not be modified within two years of the date of the custody order unless the child is seriously endangered. (*In re Marriage of Clark* (1986), 149 Ill. App. 3d 613, 616, 500 N.E.2d 1092, 1094.) The rationale for such a law is set forth in the comments to the Uniform Marriage and Divorce Act (Uniform Act) (9A U.L.A. §409, Comment, at 628-29 (1987)). Section 610 of the Marriage Act was modeled after the Uniform Act (see Ill. Ann. Stat., ch. 40, par. 610, Historical and Practice Notes, at 93 (1980)), and the comments to the Uniform Act have been cited with approval by Illinois courts. (See *In re Custody of Harne* (1979), 77 Ill. 2d 414, 420, 396 N.E.2d 499, 501-02; *In re Marriage of Noble* (1989), 192 Ill. App. 3d 501, 508-09, 548 N.E.2d 518, 522.) The comments state:

> "Most experts who have spoken to the problems of post-divorce adjustment of children believe that insuring the decree's finality is more important than determining which parent should be the custodian. See Watson, The Children of Armageddon: Problems of Custody Following Divorce, 21 Syracuse L.

Rev. 55 (1969). This section is designed to maximize finality (and thus assure continuity for the child) without jeopardizing the child's interest. *** Any change in the child's environment may have an adverse effect, even if the noncustodial parent would better serve the child's interest." (9A U.L.A. §409, Comment, at 628-29 (1987).)

Section 610(a) of the Marriage Act attempts to ensure continuity and stability for the child by providing, once the court has determined with which parent the child should be placed, the child's living arrangements will not be disturbed—absent serious endangerment—for the following two years. Section 610 of the Marriage Act, in furtherance of the goal of maintaining continuity and stability in the life of the child, creates a presumption in favor of retaining the custodial parent. (*In re Marriage of Gunter* (1981), 93 Ill. App. 3d 1043, 1048, 418 N.E.2d 149, 153.) In order to overcome the presumption in favor of retaining the custodial parent, the noncustodial parent must establish the child is seriously endangered and circumstances have changed. After the presumption in favor of the custodial parent has been overcome, the petitioner must establish the proposed modification would be in the best interests of the child. In the present case, the trial court found the modification would be in the best interests of the child. Tracey has not appealed this determination. The issue on appeal is whether the presumption in favor of the custodial parent has been overcome because of Tracey's incarceration.

While we agree when the custodial parent has been incarcerated, the noncustodial parent need not show serious endangerment to prevail on a motion for modification of custody, we reject Randy's argument that a parent forfeits her right to custody by virtue of violating the custody decree or applicable statutes.

### IV. VIOLATION OF CUSTODIAL DECREE OR AGREEMENT OR OF APPLICABLE LAW AS FORFEITURE OF RIGHT TO CUSTODY

Randy argues because Tracey removed Cassandra from the State without the court's permission and did not inform him of her telephone number and address, she forfeited her right to custody of Cassandra. This argument is based on *dicta* in the second district's *Oertel* decision.

The marriage of Bruce and Robyn Oertel was dissolved in 1989. (*Oertel*, 216 Ill. App. 3d at 807, 576 N.E.2d at 437.) Bruce and Robyn entered into a marital settlement agreement, which was incorporated into the judgment for dissolution. The agreement provided Bruce and Robyn would have joint custody of Jessica, their minor child; Bruce

would have physical possession of Jessica during the academic year, and Robyn would have physical possession of Jessica during the summer months. The agreement *expressly conditioned* each party's right to physical possession of Jessica upon the party's residence with his or her parents. (*Oertel*, 216 Ill. App. 3d at 807, 576 N.E.2d at 437.) In 1990, Robyn filed a petition for modification of joint custody. One of the bases for modification of custody was that Bruce was no longer living with his parents. Bruce and Robyn presented an agreed order vacating the custody provision of the dissolution order which provided for joint custody. (*Oertel*, 216 Ill. App. 3d at 814, 576 N.E.2d at 442.) The order was entered by the circuit court, but the next day, under the erroneous belief it had no jurisdiction to enter such an order, the trial court vacated the order. *Oertel*, 216 Ill. App. 3d at 808, 576 N.E.2d at 438.

After a hearing on the merits of the petition, the court ruled Robyn had not shown Jessica was seriously endangered in her present environment. Robyn appealed, alleging the court should not have applied the serious endangerment test, but should instead have determined whether a change in custody was in Jessica's best interests. (*Oertel*, 216 Ill. App. 3d at 812-13, 576 N.E.2d at 440-41.) The second district reversed the trial court, holding the agreed order vacating the custody provisions of the dissolution order was a stipulation within the meaning of section 610 of the Marriage Act. (*Oertel*, 216 Ill. App. 3d at 814, 576 N.E.2d at 442.) When the parties stipulate to a modification of the custody order, it is unnecessary to establish serious endangerment. (*Oertel*, 216 Ill. App. 3d at 815, 576 N.E.2d at 442.) Thus, the second district determined the trial court erred in holding a showing of serious endangerment was required, and the circuit court should have determined whether a change in custody was in Jessica's best interests. *Oertel*, 216 Ill. App. 3d at 814, 576 N.E.2d at 442.

Although the second district determined the requirement of a showing of serious endangerment was obviated by the stipulation to modify custody, in *dicta*, the *Oertel* court noted since Bruce failed to comply with the express condition of his right to custody, the trial court would not have been modifying custody by changing custody from Bruce to Robyn. Specifically, the court stated:

"We further note that even if the parties had not agreed to vacate the terms of the prior judgment, Bruce's violation of the provision requiring him to live with his parents would have justified terminating his custody rights. The trial judge stated that, even if Bruce did violate this provision, section 610(a) would only permit him to modify custody within two years if

there was evidence of serious endangerment. This conclusion was completely erroneous. Section 610(a) only limits a trial court's ability to *modify* a custody judgment. The custody judgment in this case expressly conditioned Bruce's physical possession of Jessica on his continued residence with his parents. Thus, the trial judge would not have been modifying the custody judgment by terminating Bruce's right to custody for violating the provision in question; he would have merely been enforcing the terms of that judgment." (Emphasis in original.) *Oertel*, 216 Ill. App. 3d at 816, 576 N.E.2d at 443.

We do not believe the *Oertel dicta* may be read as broadly as Randy suggests. In *Oertel*, the court noted terminating the father's right to custody based on his failure to comply with the *express condition* on his physical right to custody would not constitute modification, but merely enforcement of the custody judgment. As the right to physical custody was expressly conditioned upon Bruce's residence with his parents, we agree terminating Bruce's right to *physical* custody of the minor would not constitute a modification, but rather an enforcement, of the custody judgment. We would, however, reject the reasoning that by failing to comply with an express condition of the *physical* custody of the minor, the parent's *physical and legal* custody could be terminated under the guise of enforcement, rather than modification, of the custody judgment.

■ To the extent the *Oertel dicta* is persuasive, it would be limited to cases in which there has been a violation of an express condition of the right to custody, whether physical, legal, or both. We do not believe the reasoning of the *Oertel dicta* may be expanded to encompass noncompliance with other provisions of the custody judgment or applicable statutes which do not operate as an express condition on the right to custody. Under Randy's interpretation of the *Oertel dicta*, which was accepted by the trial court, *any* violation of the custody order or applicable statutes by the custodial parent would result in the custodial parent's forfeiture of the right to custody and would permit the modification of custody in the absence of a showing of serious endangerment. This would undermine the serious endangerment and changed circumstances provisions of the Marriage Act, and jeopardize the stability and continuity the provisions were designed to enforce. Moreover, it invites the "ping-pong" litigation the legislature intended to prevent in enacting section 610(a) of the Marriage Act.

Randy's interpretation of the *Oertel dicta* would jeopardize the stability and continuity of the child's life by expanding custody modification beyond the circumstances authorized by section 610(a) of the

Marriage Act. For example, Tracey removed Cassandra from the State without the permission of the court and neglected to furnish Randy with the address and telephone number of Cassandra's out-of-State location, in violation of section 609 of the Marriage Act. (Ill. Rev. Stat. 1991, ch. 40, par. 609.) These transgressions, while not to be encouraged, are insufficient, standing alone, to constitute changed circumstances necessary to support a change of custody (see *Gunter*, 93 Ill. App. 3d at 1049, 418 N.E.2d at 154; *In re Custody of Potts* (1980), 83 Ill. App. 3d 518, 522, 404 N.E.2d 446, 449) though they would under Randy's interpretation of the *Oertel dicta*.

Similarly, the requirement that serious endangerment be established is intended to prevent the "ping-pong litigation" of custody disputes. Specifically, the two-year waiting period is designed to discourage the noncustodial parent who tries to punish the custodial parent by means of frequent motions to modify. (Ill. Ann. Stat., ch. 40, par. 610(a), Historical and Practice Notes, at 94 (1980).) Randy's interpretation of the *Oertel dicta* does not have the effect of discouraging litigation, but invites the noncustodial parent to file a petition to modify upon the incidence of every infraction of the custody order or custody provisions of the Marriage Act. We reject Randy's argument and disapprove of the circuit court's reliance on the *Oertel dicta* in this case.

### V. EXCEPTION TO THE REQUIREMENT OF A SHOWING OF SERIOUS ENDANGERMENT

The application of section 610 of the Marriage Act when a custodial parent is incarcerated presents a unique issue. The parties have provided us with two distinct methods of resolving custody issues under these circumstances. Tracey suggests the incarcerated custodial parent should remain the nominal custodian of the child, and should be able to designate a temporary custodian, even over the objection of the noncustodial parent. Under this scenario, the noncustodial parent would be prevented from petitioning for removal of the child from the home of the temporary caregiver to the home of the noncustodial parent absent a showing the child was seriously endangered in the temporary caregiver's home. Conversely, Randy contends acceptance of Tracey's position would permit a nonparent to have custody over the child in contravention of the parent's superior right to custody. Randy asserts a better resolution of this issue is to find that when the stability and continuity in the child's life have already been disrupted by the custodial parent's incarceration, custody may be modified in the absence of the establishment of serious endangerment if it is in the best interests of the child. We find Randy's argument persuasive.

## A. *Natural Parent's Superior Right to Custody*

Allowing Tracey to remain the nominal custodian and designate a temporary caregiver, over Randy's objection, would contravene his superior right as a parent to the custody of Cassandra. There is an affirmative presumption the right of a natural parent to the custody of a child is superior to the claim of a third person. (*In re Custody of Peterson* (1986), 112 Ill. 2d 48, 51, 491 N.E.2d 1150, 1151.) Neither parent's right to the care, custody, and control of the child is superior to that of the other parent. (*People ex rel. Irby v. Dubois* (1976), 41 Ill. App. 3d 609, 612, 354 N.E.2d 562, 565.) However, we do not believe the equal right of one parent to the care, custody, and control of the child encompasses the right to shift custody of the child to a third party.

Upon her incarceration, Tracey became unable to fulfill her role as Cassandra's physical custodian. No Illinois authority stating an incarcerated parent continues to hold custody of his or her child has been cited to us. On the contrary, the first district has held an incarcerated parent does not have physical custody of the child: "[p]hysical custody" is defined in the Uniform Child Custody Jurisdiction Act as "actual possession and control of a child" (Ill. Rev. Stat. 1979, ch. 40, par. 2103.08). (*Milenkovic v. Milenkovic* (1981), 93 Ill. App. 3d 204, 212, 416 N.E.2d 1140, 1145.) Such a holding is logical, because an incarcerated parent, much like a deceased parent, is no longer able to care for, supervise, provide a home, prepare food, obtain medical treatment, or be involved in the daily life of the child. In short, an incarcerated parent cannot fulfill the role of a physical custodian of the child. Although incarceration may not absolutely prevent a parent from fulfilling the role of the child's legal custodian, it does impair this ability. The parent is not readily available to give advice or console the child, or to be an example. Further, the incarcerated parent is not readily available to consent to medical treatment and decide other issues generally reserved to legal custodians.

The *emergency* placement of a child in the care of a neighbor or relative is foreseeable and understandable in the case of a custodial parent being taken into custody. Regardless of whether the child's parents are able to agree upon the child's future custodial arrangements or whether a court determination of those arrangements will be necessary, the child's needs cannot wait for an agreement, litigation, or for the noncustodial parent to travel to the child's location. The child has needs which must be met immediately. The incarceration of a custodial parent presents an emergency situation, as the

child immediately loses the provider of his or her food, shelter, and supervision. It would be natural under these circumstances for the custodial parent to request a relative or neighbor to provide food, shelter, and supervision for the child.

While the incarcerated parent has the right to make emergency arrangements for the child's immediate care, the incarcerated parent cannot dictate that the third party continue to act as temporary custodian for the child for the duration of his or her incarceration, defeating the noncustodial parent's right to custody. The supreme court's decision in *Harne* indicates, albeit under different circumstances, that the court does not look favorably upon a custodial parent who is not in actual physical custody of the child attempting to direct the children be placed with a third party. (Contra *Harne*, 77 Ill. 2d at 416, 396 N.E.2d at 500 (parent with physical custody, not custodial parent, placed children with third party).) Gene and Nancy Harne were divorced in 1972. The decree awarded custody of their two minor children to Nancy. In 1975, Nancy found herself unable to provide adequate care for the children, and she placed them with their maternal grandparents. In 1976, Gene filed a petition for modification of custody. (*Harne*, 77 Ill. 2d at 416, 396 N.E.2d at 500.) Nancy testified she did not want actual physical custody of the children, but preferred they remain with the maternal grandparents. The grandparents were elderly and if anything happened to them she would take physical custody of the children. (*Harne*, 77 Ill. 2d at 417, 396 N.E.2d at 500.) The circuit court found Nancy did not "have the stability or ability that is necessary to maintain and care for the children, that they have been living with their grandparents rather than [Nancy], and that under these circumstances, their present environment could seriously affect their physical, mental, moral or emotional health." (*Harne*, 77 Ill. 2d at 422, 396 N.E.2d at 502.) The circuit court therefore transferred legal custody of the children to their father. The appellate court majority reversed. (*In re Custody of Harne* (1978), 66 Ill. App. 3d 820, 823, 384 N.E.2d 460, 462-63.) The supreme court reversed the appellate court and affirmed. *Harne*, 77 Ill. 2d at 423, 396 N.E.2d at 503.

The circumstances resulting in Nancy's relinquishment of her children to a relative are distinct from Tracey's placement of Cassandra with Parker here. The *Harne* case also differs in that serious endangerment was found by the circuit court in *Harne*, while the circuit court here found it was unnecessary to establish serious endangerment. However, *Harne* is instructive on whether the custody rights of a custodial parent include the ability to designate that the children

should be cared for by a nonparent over the objection of the non-custodial parent.

In the present case, upon her arrest, Tracey specified she wished Parker to have "temporary guardianship" of Cassandra from the time of her arrest until her sentencing. If incarcerated, Tracey wished temporary custody to be changed from Parker to Jean, Tracey's mother, and Patton, another one of Tracey's sisters. During her incarceration Tracey wished Jean and Patton to exercise "joint custody and guardianship." The natural parent's superior right to custody would likely prevent Parker, Jean or Patton from prevailing over Randy in a custody dispute involving Cassandra. To allow Tracey to remain Cassandra's nominal custodian while delegating the fulfillment of custodial duties to a nonparent would permit Tracey and her relatives, acting in concert, to do indirectly that which could not be done directly.

The custodial parent's attempt to make a binding designation of a "temporary custodian" contravenes the noncustodial parent's superior right, as a parent, to the custody of the child over a third party. Moreover, in the case of an incarcerated parent who has placed the children with a relative or neighbor, to require the noncustodial parent to show the child is seriously endangered to wrest the child from that relative or neighbor is inconsistent with the noncustodial parent's superior right to custody over that of the relative or neighbor.

### B. *Incarceration of the Custodial Parent is Analogous to Death of the Custodial Parent*

Illinois courts have not previously explicitly recognized an exception to the statutory requirement that serious endangerment to the child be established for custody to be modified within two years of the original custody order. However, the courts have implicitly recognized an exception in one situation—where the custodial parent dies within two years of the custody order. In the present case, the circuit court analogized this case to one in which the custodial parent had died. Specifically, ruling on the motion to reconsider, the court stated:

"When you talk of serious endangerment I see one serious flaw with that argument under these circumstances and that would be a situation typical of this say perhaps the mother has custody. Judgment has just been entered. She finds out that she's sick. She places the child with the grandmother. She goes into the hospital and dies on the operating table two months after getting custody. Now, according to what you say *** the only way the biological father could get that child is by saying that

that child's welfare was seriously endangered, and even in that scenario that I painted the grandmother is taking excellent care of the child, nobody disputes that, and I can't contemplate that's what the legislature meant nor that the courts would rule that for the period of two years the father couldn't file a petition to get his own child back."

In order to determine whether it is appropriate to create an exception to the statutory requirement of establishing serious endangerment in the case of an incarcerated parent, we examine the rationale for such an exception in the case of the death of the custodial parent. Upon the death of the custodial parent, the legal custody of the child is in no one, and the court is empowered to make a determination regarding who is to be awarded custody of the child, based upon the best interests of the child. (*Milenkovic*, 93 Ill. App. 3d at 212, 416 N.E.2d at 1145-46.) Similarly, since a deceased person cannot be said to be in physical custody of a child, the custodial parent's physical custody of the child also terminates upon the custodial parent's death. (See *Milenkovic*, 93 Ill. App. 3d at 211-12, 416 N.E.2d at 1144-45.) Since the custodial parent's legal and physical custody of the child has been terminated by the legal custodian's death, the deceased former custodial parent cannot be *retained* as the custodial parent, and there is no presumption in favor of retaining a custodial parent to be overcome. There is no longer any reason to require a showing of serious endangerment. Serious endangerment is a threshold requirement which must be met to overcome the presumption, but in the absence of the presumption there is no need for the threshold requirement.

In *Peterson*, the supreme court ruled on issues involving a custody dispute between the biological father and the maternal grandparents. The marriage of James and Felicia Peterson was dissolved in February 1983. The court awarded custody of Lynette, their minor child, to Felicia. Felicia and Lynette lived with Felicia's parents. In May 1984, Felicia died. After the funeral, James requested Felicia's parents turn Lynette over to him. They refused and both parties filed petitions for modification of custody. (*Peterson*, 112 Ill. 2d at 51, 491 N.E.2d at 1151.) The circuit court found Felicia's grandparents had no standing to bring a petition for the modification of custody, and ordered James be given custody of Lynette. The appellate court reversed. (*Peterson*, 112 Ill. 2d at 50, 491 N.E.2d at 1151.) The supreme court then reversed the appellate court and affirmed the circuit court. The only issue before the supreme court was whether the circuit court erred in dismissing the maternal grandparents' petition for modification of custody, due to lack of standing. The supreme court found the mater-

nal grandparents did not have standing. (*Peterson*, 112 Ill. 2d at 55, 491 N.E.2d at 1153.) Although the courts did not address whether James, the noncustodial parent, was required to establish serious endangerment to the child there, we conclude it is implicit in such circumstances that such a showing is not required.

We find the incarceration of the custodial parent analogous to the death of the custodial parent. In both instances the custodial parent is no longer able to care for the child or perform other custodial duties. Although death and incarceration differ in that death terminates both legal and physical custody of the children, while incarceration terminates physical but not necessarily legal custody of the child, we believe the termination of the physical custody of the child is sufficient to obviate the need for the showing of serious endangerment. In reaching this conclusion, we find the decision of one of our sister courts persuasive. The Ohio Appellate Court has determined the custodial parent's inability to serve as the child's *physical* custodian is sufficient, in itself, to obviate the necessity that serious endangerment be established in order to modify custody. *Adkins v. Adkins* (Feb. 13, 1985), Pike App. No. 370 (unreported, 1985 WL 6537).

The marriage of Virginia and Danny Adkins was dissolved in 1979, and custody of their minor children was awarded to Virginia. In February 1983, Virginia placed the children in the home of Buddy and Barbara Carnley, in Florida. At some time in 1983, Virginia was convicted of aggravated robbery and involuntary manslaughter and sentenced to the reformatory for a period of 7 to 25 years. On March 22, 1983, after Virginia's arrest and confinement, Danny filed a motion to modify the previous custody order requesting custody of the children. On June 9, 1983, Virginia filed a motion to modify the original custody order by awarding custody to the Carnleys. The Ohio statute regarding modification of custody read as follows:

"Except as provided in division (B)(2) of this section, the court shall not modify a prior custody decree unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, his custodian, or either joint custodian, and that the modification is necessary to serve the best interest [*sic*] of the child. In applying these standards, the court shall retain the custodian or both of the joint custodians designated by the prior decree, unless one of the following applies:

(a) The custodian or both joint custodians agree to a change in custody."

(b) The child, with the consent of the custodian or of both custodians, has been integrated into the family of the person seeking custody.

(c) The child's present environment endangers significantly his physical health or his mental, moral, or emotional development and the harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child." (Ohio Rev. Code Ann. §3109.04(B)(1) (Anderson 1989).)

Virginia argued absent a finding that either factor (a), (b), or (c) existed, the court was without authority to modify its original custody order granting her custody. The trial court rejected this argument and found it would be in the best interests of the children to grant custody to Danny. Affirming the trial court, the court of appeals held under the facts of the case, the trial court could modify the original order of custody without a finding of the existence of one of the enumerated statutory factors. The court recognized the State legislature had intended to limit the court's discretion in custody proceedings by authorizing the court to modify a prior custody order only if one of the enumerated criteria is established, otherwise the prior custodian must be retained. However, the court found where the custodial parent is incarcerated, there was no issue regarding the *retention* of the prior custodian, because the prior custodian was unable to perform any of the custodial functions by reason of her lengthy imprisonment, and a change of custody is concededly required. The court found the enumerated statutory factors were not required to be met in that case.

The factors enumerated in the Ohio statute are almost identical to an earlier Illinois statute regarding modification (Ill. Rev. Stat. 1977, ch. 40, par. 610(b)) and similar to the current Illinois statute regarding modification. Moreover, both the Ohio and Illinois legislatures, in enacting the provisions regarding modification, intended to limit a court's ability to modify custody orders. Compare Ohio Rev. Code Ann. §3109.04(B)(1) (Anderson 1989) with Ill. Ann. Stat., ch. 40, par. 610, Historical and Practice Notes, at 93-97 (1980).

■ We find the reasoning of the Ohio Appellate Court persuasive and, accordingly, hold an incarcerated custodial parent, by virtue of his or her incarceration, does not have physical custody of a child and there is no longer a presumption in favor of retaining him or her as the custodial parent. Since the purpose of establishing serious endangerment is to rebut a presumption in favor of retaining the custodial parent, it is therefore unnecessary to establish serious endangerment.

## C. *The Continuity and Stability in the Child's Life Have Already Been Disrupted*

■ Our holding is not inconsistent with the legislative intent of promoting continuity and stability of the child's environment. The child's environment has already been disrupted by the incarceration of her custodial parent and the shifting of physical possession of the child from the custodial parent to another person. Requiring the noncustodial parent to establish serious endangerment before custody may be modified would not preserve stability and continuity in the child's life. Our holding is not inconsistent with the legislative goal of preventing the noncustodial parent from engaging in continued custody litigation in order to punish the custodial parent. The exception to the requirement of establishing serious endangerment is restricted to instances of a custodial parent's incarceration resulting in the child being cared for by a third party.

## D. *The Legislature, in Enacting Section 610 of the Marriage Act, Did Not Contemplate the Situation in Which the Custodial Parent Becomes Incarcerated*

■ Section 610(a) of the Marriage Act contemplates a situation in which both the custodial parent and the noncustodial parent are legally and physically available to act as the child's legal and physical custodian, and the parents are litigating the removal of the child from the home of the custodial parent, and relocation of the child to the home of the noncustodial parent. In such a circumstance there is a presumption in favor of retaining the custodial parent which may be overcome only by establishing serious endangerment. However, in the case of the incarceration of the custodial parent, several factors weigh in favor of holding serious endangerment need not be established: (1) the custodial parent is no longer able to act as the child's custodian; hence, there can be no presumption in favor of retaining the custodial parent; (2) the stability and continuity of the child's life have already been disrupted by the custodial parent's incarceration and the shift of the care of the child from the custodial parent to another; and (3) allowing the incarcerated parent to unilaterally designate a nonparent caretaker over the objection of the noncustodial parent contravenes the noncustodial parent's superior right to the custody of the child over the rights of the nonparent.

When a parent to whom custody was originally awarded is incapable, due to his or her incarceration, of continuing physical custody of the child, and the child is being cared for by a third party, that is a

significant change in circumstances and custody may be modified without establishing serious endangerment *if such modification is in the best interests of the child.* The trial court properly found Randy was not required to show serious endangerment in order to cause the child's removal from the third party, and relocation to his custody. To require him to establish serious endangerment before Cassandra could be removed from the third party would contravene his superior right, over that of the third party, to the custody of his daughter and would not serve the legislative goals of providing stability and continuity and discouraging litigation.

## VI. BEST INTERESTS ANALYSIS

■ We note our holding does not mandate that in *every* case an incarcerated custodial parent will, upon the petition of the non-custodial parent, lose custody of the child. The proposed modification must still be in the best interests of the child. There may be situations in which the custodial parent has been incarcerated, but it still would not be in the best interests of the child to modify the custody award. For example, where the term of incarceration is minimal in duration, or the custodial parent has remarried and the custodial parent and his or her new spouse have made a good home for the child in which the child could appropriately live during the custodial parent's incarceration, a trial court might conclude a modification was not in the child's best interests.

Tracey has not appealed the circuit court's determination that a modification of custody was in Cassandra's best interests; however, we note this determination was not against the manifest weight of the evidence. There are several factors supporting the circuit court's determination that a custody modification was in Cassandra's best interests. Tracey thwarted Randy's attempts to visit Cassandra, removed Cassandra from the State without the permission of the court, and concealed her whereabouts from Randy as well as Jean, Cassandra's maternal grandmother. This was disruptive to Cassandra's life and family relationships. Once in Georgia Tracey married a man whom she had known for one month and introduced this man into Cassandra's life as a stepfather. Tracey was also to be imprisoned for a period of eight months to two years, and wanted Cassandra to be cared for by various relatives during this period. Randy, on the contrary, had offered to provide a stable life for Cassandra in proximity to her paternal and the majority of her maternal relatives, to facilitate visitation, and provide Cassandra with care by her paternal grandparents while he is at work. The court's determination it was in Cassandra's best

interests to be placed in the stable home of her biological father, rather than in the home of her aunt in Georgia, or with other maternal relatives, was not against the manifest weight of the evidence.

## VII. Conclusion

We disapprove of the trial court's reliance on the *Oertel dicta* in this case, but we affirm the trial court's determination that Randy was not required to establish serious endangerment prior to becoming entitled to a change of custody. Tracey, by virtue of her incarceration, was unable to exercise custody over Cassandra, and the modification of custody was in Cassandra's best interest. We affirm the order of the circuit court of Logan County, ordering custody of Cassandra be modified in favor of Randy.

Affirmed.

McCULLOUGH and LUND, JJ., concur.