THE DEPARTMENT OF PUBLIC AID *ex rel.* LINDY DAVIS, now known as Lindy Eddy, Petitioner-Appellant, v. JESSE BREWER, Respondent-Appellee.

Fifth District   No. 5—97—0016

Opinion filed September 30, 1997.

Frank B. Schweitzer, of Taylorville, for appellant.

William E. Farr, of Pana, for appellee.

JUSTICE HOPKINS delivered the opinion of the court:

Petitioner, Lindy Eddy, appeals from the trial court's order modifying the custody of the two minor children of Lindy and respondent, Jesse Brewer. The trial court transferred the custody of the two children from Lindy, their mother, to Jesse, their father, in an order dated December 2, 1996. Lindy argues that the trial court applied the wrong burden of proof to Jesse's petition for modification and that the trial court's decision to change custody is against the manifest weight of the evidence. For reasons we will more fully explain, we reverse and remand.

## I. FACTS

Tasia Lee Davis was born to Jesse and Lindy on April 26, 1991. Lindy and Jesse were not married at the time and have never been married to each other. On September 9, 1991, the circuit court of Fayette County entered an order establishing Tasia's parentage by consent of Lindy and Jesse. Nathan Silas Davis was born to Lindy on July 30, 1992. Jesse and Lindy were no longer living together at the time of Nathan's birth. On July 1, 1994, the Fayette County circuit court entered an agreed order that Jesse would pay $50 per week in child support for Tasia. On September 30, 1994, an agreed order was entered establishing Jesse as Nathan's biological father and setting child support for both children at $65 per week. On December 2, 1994, the Fayette County circuit court entered an order approving a stipulation entered into between Jesse and Lindy setting a schedule of visitation for Jesse and the children.

On November 21, 1995, the case was transferred from Fayette County to Christian County, where both parties were then residing. On December 15, 1995, in the Christian County circuit court, Jesse filed a petition for modification, alleging that the circumstances of the children had changed, that "the environment at [Lindy's] house is a serious danger to the minor children's physical, mental and emotional health," due to the sexual abuse of both children by the son of the children's babysitter, and that Lindy "knowingly and continuously delivered the children to a babysitter whose environment was a danger to their physical and mental health."

In October and November 1996 an evidentiary hearing was held on Jesse's petition for modification. On the first day of the hearing, Lindy's attorney argued that since the petition to modify was filed and being heard within two years of the date of the custody order which it sought to modify, Jesse would be required to prove, by clear and convincing evidence, that the present custodial arrangement seriously endangered the children's physical, mental, moral, or

emotional health, pursuant to section 610 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/610 (West 1994)). The statute provides, in pertinent part, as follows:

> "(a) Unless by stipulation of the parties, no motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health.
>
> (b) The court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian ***, and that the modification is necessary to serve the best interest of the child." 750 ILCS 5/610 (West 1994).

Jesse's attorney agreed that he "definitely" would be required to prove serious endangerment to the children, and he stated that he was prepared to present that evidence. Jesse did not file any affidavit in support of his petition to modify, but Lindy's attorney agreed to waive the affidavit requirement of section 610(a).

Lindy testified that Tasia and Nathan have always lived with her. At the time of the hearing, Tasia was five years old and in kindergarten. Nathan was four years old and in preschool. Lindy works mornings once or twice a week and at night the rest of the time. Lindy has been married to Kevin Eddy since October 29, 1994. Kevin did not have any children of his own at the time of the hearing, but Lindy was pregnant with their first child. Kevin works during the day, so the children currently stay with Diana Davis when Lindy and Kevin are both working.

Jesse has been married to Karen Poteet since May 21, 1995. Karen does not have any children of her own. Jesse's visitation with the children includes every other weekend and holiday and three separate week-long visits in the summer, which initially began in June 1995.

Both of the parents and their respective spouses testified that they each loved the children and disciplined them appropriately. Both parties called several character witnesses to testify about the relationship of that parent and stepparent with the children. All of the witnesses expressed approval of the parent and stepparent for whom each testified.

The evidence Jesse presented in support of his request for custody of the children was in three basic areas: that Lindy failed to have the

children immunized according to recommended schedules, that Lindy bit Nathan one time in discipline for his biting behavior, and that Lindy knew about the sexual abuse of the children at the home of the babysitter but did not adequately protect the children.

As to the immunizations, the evidence was that Lindy was late in getting the children's necessary immunizations and that her failure in this regard amounted to tardiness but not medical neglect. Both children were current in all of their immunizations at the time of the hearing. As to the biting, the evidence was undisputed that Lindy bit Nathan one time in an attempt to stop him from biting other children, after she had tried several other disciplinary measures without curing Nathan of the biting. The bite from Lindy caused a bruise on Nathan's arm. When Jesse and Karen noticed the bruise during the children's first week of visitation in June 1995, Nathan told them it came from a bite from his mother. Karen, who is a social worker and a mandated child abuse reporter, called the Department of Children and Family Services (DCFS). DCFS investigated but took no formal action relating to the bite. The trial court did not base its decision on the evidence regarding the immunizations or the bite, and the court stated that the evidence about the immunizations and the biting was insufficient alone to transfer custody to Jesse.

As to the sexual abuse, the evidence is not in dispute that sometime during the summer of 1995 Tasia and Nathan were each sexually abused at least one time by Dustin Drone, the teenage son of Nancy Drone, the babysitter Lindy used for the children until sometime in July of 1995. What knowledge Lindy had, what Lindy should have inferred or suspected based on that knowledge, and what Lindy could or should have done to protect the children from the abuse are areas of major dispute between the parties.

Lindy's version of the events relating to the sexual abuse is as follows: She had known Nancy and her husband George most of her life. Lindy and Jesse lived with Nancy and George for a while before Tasia was born. Dustin also lived there at the time. When Lindy was a teenager and Dustin was about 10 years old, Lindy learned that Dustin had been sexually molested. Lindy testified that she forgot about the fact that Dustin had been molested until she learned that Dustin molested her children. Nancy baby-sat for Lindy's children, but she was not licensed as a child care facility. Tasia and Nathan stayed with Nancy while Lindy was at work during a period of about two years, ending sometime in July 1995.

Sometime in May 1995, Tasia complained to Lindy that her "pee-pee" hurt. Lindy examined Tasia, whose vaginal area was red and irritated. Tasia did not report any problems or exhibit any other

unusual behavior. Lindy was not particularly alarmed, because Tasia was prone to infections in this area of her body. Lindy changed Tasia's soap and bubble bath, and the irritation and redness went away.

At the end of June 1995, when Tasia was four years old and Nathan was not quite three years old, Nancy informed Lindy that Nancy had observed Tasia acting inappropriately, lying on top of another child and moving up and down in what Nancy felt was a sexual manner. Lindy and Kevin both testified that they never saw Tasia acting in the manner described by Nancy. After Nancy told Lindy about Tasia's behavior, Lindy met with Cheryl Woods, a counselor for Shelby County Mental Health. Cheryl told Lindy that Lindy would have to report the information to DCFS or Cheryl would be required by law to do so. Lindy called DCFS and reported the information, but according to Lindy, DCFS chose not to investigate further, because "neither of the kids would tell the counselor [Cheryl] who was doing what."

Cheryl's testimony corroborated Lindy's. Cheryl met with Lindy, who reported concerns about both children's behavior, the "humping" behavior of Tasia and Nathan reaching under Tasia's blouse and touching the "lower part" of Tasia's body. After meeting with Lindy, Cheryl met with the children in June and July of 1995. The children did not say anything to Cheryl that indicated they were the victims of sexual abuse, but Tasia reported that when they stayed overnight with Jesse, she and Nathan both slept in the same bed with Jesse and Karen. After meeting with the children in July 1995, Cheryl did not request any further visits with the children because they did not indicate any high-risk factors and Cheryl felt that if the need arose, Lindy would call to schedule further appointments.

Lindy did not tell Jesse about Nancy's information or that she took the children to a counselor, because Lindy suspected Jesse of somehow causing or contributing to the inappropriate behavior. Lindy testified that when the inappropriate behavior began, the only change in the children's lives was that they had just finished their first week-long visit with Jesse, and Tasia came home reporting that she and Nathan slept in the same bed as Jesse and Karen. Lindy testified that she also suspected her husband because the counselor told her to pay attention to everyone's behavior and not rule anyone out as a potential suspect.

After talking to Cheryl, Lindy went to an attorney to try to have Jesse's visitation stopped so that Lindy could figure out what was happening with the children. However, the attorney did not return Lindy's phone calls, and Lindy did not pursue the matter any further. Lindy testified that the children went to Nancy's only a couple

of times after the end of June 1995, and Lindy stopped using her as a babysitter sometime around the end of July 1995 because Nancy became "unreliable," not being at home when Lindy arrived with the children for scheduled babysitting. Lindy testified that at the time she stopped using Nancy as a babysitter, she did not suspect Dustin of any kind of sexual abuse of the children.

Lindy testified that she was in the process of packing to move to a different house at the end of June 1995. She further testified:

> "I don't know how we got on the subject of it or whether it was just come up [sic] or what it was. But I remember Tasia said, 'I know how to kiss like that.' Just out of the blue. And I said, 'Like what?' And she said, 'With my tongue.' "

Lindy testified that she asked Tasia how she knew how to kiss like that. She further testified:

> "That's all she said. And then after she said Dustin, I thought, well, how am I going to get her to tell me any more?
>
> So I asked her, I said, 'Did Dustin kiss you?' because that was my first thought, you know.
>
> And she said no. She said, 'I saw...' And then she stopped.
>
> And then I said, 'Did you see Dustin kiss someone else?'
>
> And she said 'yes,' and then she said 'no,' and then she turned around and started on a different conversation and started playing."

Kevin also testified about Tasia's remark, and his testimony corroborated Lindy's testimony.

Lindy testified that after Tasia made these remarks, she went to Nancy's house to question her. Lindy left the children with Kevin so that she could talk to Nancy alone. Lindy testified that she asked Nancy if Dustin, who was 16 years old at the time, was ever around the children. Nancy claimed that Dustin was not around the children but that he might have been in the house watching television in the living room. Lindy testified as to what she told Nancy: "[I]f the kids are ever there, to watch both of them, how they act, listen to what they say; watch all the kids around them. Make sure that they are not around any kids by themselves without her supervision, without her or George being there. I just wanted her to help me out." Lindy testified that after Nancy told her that Dustin was never around the children, Lindy thought there was no way that Dustin could have kissed Tasia. Lindy stated that the children stayed with Nancy only once or twice after Tasia made the statement about French-kissing.

Sometime in August 1995, after Lindy and Kevin and the children moved, Dustin broke into Lindy's former residence. Lindy did not know that Dustin broke in until she got a phone bill that showed

that a 900-number telephone call had been placed from Dustin's residence, charging the call to Lindy's checking account number. Lindy surmised that Dustin found one of her cancelled checks left in her former residence and used the number off of it to charge the phone call. Lindy testified that she was not using Nancy as a babysitter any more when this happened but that the children went a few times to Teresa Boehm, who lives close to Nancy and is Dustin's aunt.

Lindy testified that she knew nothing about Dustin molesting the children until she received a phone call from DCFS on November 2, 1995.

Jesse's and Karen's versions of the events of the summer of 1995 basically corroborate Lindy's testimony. The major areas of additional evidence or contradiction are as follows: Karen and Jesse each testified that the children were staying with them over the weekend of October 27, 1995. According to Karen, during supper, Tasia changed the subject of the conversation and said, "It's not fair." Karen testified that when asked what was not fair, Tasia said, "It's not fair that Dustin tells me that I'm going to be in trouble when he makes me suck his pee-pee." Karen asked Tasia to repeat what she had said, and Tasia repeated it. According to Karen, Nathan then said, "He made me suck his pee-pee too and he sucked on mine." Karen immediately called DCFS. Neither Karen nor Jesse reported the information to Lindy or Kevin, although it appears from the record that the children went back to their home with Lindy on Sunday, October 29, 1995.

Karen and Jesse both testified that before October 27, 1995, neither of the children made any statements or exhibited any behavior which would have alerted them that the children were being abused. Karen and Jesse both denied that either of the children ever slept in the same bed as the two of them.

Karen testified that Lindy called her on November 2, 1995, after DCFS initially contacted Lindy. According to Karen, Lindy told Karen that she had suspicions about Dustin, because Tasia had told her that Dustin French-kissed her on the mouth, and that Lindy had complained about Dustin's behavior to Nancy. Lindy denied that she told Karen that Tasia said Dustin French-kissed her. According to Jesse, Lindy told him she thought the abuse and the French-kissing might have occurred in May, June, or July of 1995.

Bert Holloway, the DCFS caseworker assigned to initially investigate the children's remarks about Dustin, testified that he interviewed the children in Karen and Jesse's home on October 28, 1995. According to Holloway, both of the children told him that they reported what Dustin did to their mother. There is nothing in the record to indicate that DCFS ever took any action against Lindy.

Jo D. Spezia Lanham, a child protection investigator for DCFS, testified that she investigated the children's allegations. As part of her investigation, she spoke to Lindy on November 30, 1995, over the telephone for 5 or 10 minutes. According to Lanham, Lindy told her that Lindy had asked Nancy to "keep an extra eye on Dustin" because Tasia told Lindy that Dustin French-kissed her.

Jesse testified that his primary reason for requesting the change of custody was that he felt that Lindy was aware of the children being abused by Dustin but that she allowed them to continue in that environment after receiving this knowledge.

At the close of Jesse's case, Lindy's attorney moved for a judgment in her favor, claiming that Jesse fell far short of meeting his burden of proving endangerment by clear and convincing evidence. Jesse's attorney argued that the "standard is somewhat in dispute here." Jesse's attorney argued that section 610(a) should be interpreted as merely prefatory and that in order to transfer custody, all the court was required to find was that Jesse had presented clear and convincing evidence of a change in circumstances and that it was in the children's best interest to modify custody. In support of his argument, Jesse's attorney cited *In re Marriage of Oehm*, 252 Ill. App. 3d 311 (1993). The trial court denied Lindy's motion for a judgment in her favor at the close of Jesse's case but did not specifically rule on the burden of proof issue.

On December 2, 1996, the trial court entered a memorandum of decision granting Jesse's petition for modification, in which the court stated, in relevant part, as follows:

> "Jesse does not have to prove that there is reason to believe that the present environment seriously endangers the children's physical, mental, moral or emotional health. This is the initial burden that must be met by affidavit to even allow the petition to be heard. It was met. The burden on Jesse is to show by clear and convincing evidence that a change in circumstances has occurred and that a modification of custody is in the best interests of the children.
>
> * * *
>
> The key issue is the matter of the sexual abuse, what Lindy knew or should have known, and what, if anything[,] she did about it. These are not easy questions to answer. The Court does not believe that Lindy knew the full extent of sexual abuse as it was occurring. If she did know and did nothing, she should not be allowed to have any contact with the children. On the other hand, one must question Lindy's judgment and sensitivity to warning signs.
>
> * * *

In fairness to Lindy, it should be noted that this is a case upon which reasonable people might disagree. The issue of whether Jesse met his burden on the best interest standard is very close. The Court placed a fair amount of weight on the influence of Karen Poteet, who, of course, is not a custodian. In the final analysis, the Court has looked closely at the totality of what happened to the children during the first year of formal custody with Lindy and, after balancing all the factors, believes that they are better off with Jesse. The Petition for Modification of Custody is granted."

## II. ANALYSIS

■ The main question posed by this appeal is how to correctly interpret section 610 of the Marriage and Dissolution of Marriage Act (the Marriage Act), as it applies to requests for the modification of custody within two years of the court's last custody order. In this case, the custody order that Jesse sought to modify was entered on December 2, 1994. That was the first order that legally established sole custody of both children in Lindy and gave certain rights of visitation to Jesse. Jesse filed his petition for modification on December 15, 1995, and the hearing on the matter was conducted in October and November 1996, within two years of the former custody order, so that the provisions of section 610(a) apply (750 ILCS 5/610(a) (West 1994)).

Here, the parties did not stipulate to allow the modification within two years. Lindy waived the affidavit requirement, but her attorney clearly stated on the record that by waiving the affidavit requirement, Lindy was *not* also waiving the proof-of-endangerment requirement.

In its order, the trial court interpreted the endangerment requirement of section 610(a) as an "initial burden that must be met by affidavit to even allow the petition to be heard." The trial court rejected Lindy's argument that Jesse was required to prove that the current custodial arrangement seriously endangered the children, and the court instead adopted the interpretation of section 610(a) advocated by Jesse and announced in the *Oehm* case. See *Oehm*, 252 Ill. App. 3d 311.

In *Oehm*, the First District Appellate Court explained its interpretation of section 610 as follows:

"According to the statute, the circuit court must find clear and convincing evidence that a change has occurred and a modification of the custody arrangement is in the best interest of the children. Both elements must be met. [Citation.] The statute, however, does not require that the circuit court find endangerment by clear and convincing evidence. The statute requires that there must be

'reason to believe' that the child's present environment may endanger him in some way." *Oehm*, 252 Ill. App. 3d at 318.

In *Oehm*, the appellate court found the endangerment requirement met by the allegations in the affidavits filed in support of and in opposition to the requested modification. *Oehm*, 252 Ill. App. 3d at 318. According to the court in *Oehm*, the endangerment standard is procedural rather than substantive, an initial hurdle that must be cleared before the parties can move on to a hearing in which the proponent of the motion need only prove by clear and convincing evidence that there has been a change in circumstances and that it is in the children's best interest to modify the former custody judgment. Based upon our review of the law, we find the interpretation of section 610 adopted by the court in *Oehm* to be incorrect.

■ The correct interpretation of section 610 as it applies to cases such as this is set forth in *Naylor v. Kindred*, 250 Ill. App. 3d 997 (1993):

> "The Illinois Parentage Act of 1984 provides modification of custody is governed by the Marriage Act. [Citation.] In the Marriage Act, the Illinois legislature has provided three requirements which must be met in a contested custody modification proceeding, before a custody order may be modified within two years of its entry. The petitioner must establish: (1) the child is seriously endangered in his or her present environment; (2) there have been changed circumstances warranting modification of the custody order; and (3) the proposed modification is in the best interests of the child. [Citation.]
>
> The limitation on custody modification within two years, absent serious endangerment, is a legislative attempt to provide stability and continuity in the child's life by preventing the 'ping-pong' litigation of custody disputes, yet provide a 'safety valve' for the modification of custody in emergency situations. [Citation.] The effect of section 610(a) of the Marriage Act is that even if the noncustodial parent would, perhaps, be a better parent for the child, custody will not be modified within two years of the date of the custody order unless the child is seriously endangered." *Naylor*, 250 Ill. App. 3d at 1004.

With the exception of the *Oehm* case, the overwhelming majority of the Illinois Appellate Court cases have interpreted section 610 as did the court in the *Naylor* case. Here, we list, by appellate court district, the *Naylor* case and the cases adopting an interpretation of section 610 similar to that adopted in the *Naylor* case: *McClelland v. McClelland*, 231 Ill. App. 3d 214, 219 (1st Dist. 1992) (*McClelland* predates the decision in *Oehm*, but the court in *Oehm* does not refer to or specifically overrule *McClelland*); *In re Marriage of Kading*, 150

Ill. App. 3d 623, 631-32 (2d Dist. 1986); *In re Custody of Carter*, 137 Ill. App. 3d 439, 442 (2d Dist. 1985); *In re Marriage of Johnson*, 245 Ill. App. 3d 545, 554 (3d Dist. 1993); *In re Marriage of Clark*, 149 Ill. App. 3d 613, 615 (3d Dist. 1986); *Naylor v. Kindred*, 250 Ill. App. 3d 997, 1004 (4th Dist. 1993); *In re Marriage of Cripe*, 183 Ill. App. 3d 37, 43 (5th Dist. 1989).

In *Cripe*, this court followed the second district's ruling in *Carter* that an order modifying custody within two years of the latest custody order "must contain express findings of fact that the children's present environment seriously endangers their physical, mental, moral or emotional health and that the modification of custody is necessary to serve the best interests of the children." *Cripe*, 183 Ill. App. 3d at 43.

In *Carter*, the second district held that the parent seeking a modification of custody within two years must prove (1) that the child's present environment endangers the child's physical, mental, moral, or emotional health, (2) that a change in circumstances has occurred, and (3) that the modification is necessary to serve the best interest of the child, all by clear and convincing evidence. *Carter*, 137 Ill. App. 3d at 442. The rationale for requiring proof of endangerment at the hearing, rather than simply by way of affidavit prior to the hearing, is that "[i]t would make little sense to require a preliminary showing of endangerment if that was not one of the standards to be applied later at trial." *Carter*, 137 Ill. App. 3d at 442. We agree with the ruling in *Carter*, as did this court in *Cripe*. Moreover, under the ruling in *Carter*, where the trial court fails to make express findings of endangerment, the order modifying custody within two years is void and must be reversed. *Carter*, 137 Ill. App. 3d at 443.

We additionally agree with *Carter* that without proof of endangerment and specific findings to that effect, an order modifying custody within two years is void. Without such a rule, after the time elapsed to reach a decision on appeal, the two-year period would often have passed, so that the children's custodian would change by default rather than by proof. Without the strong deterrent against changing custody within two years provided by the endangerment standard, and without a rule that orders modifying custody within two years are void absent specific findings of endangerment, noncustodial parents would be encouraged to file petitions to modify custody regardless of when the court last decided custody. Such a lenient rule would contravene the goal of maintaining continuity and stability in the lives of children and would make a mockery of the overriding rule that, above all, the children's best interests are paramount.

■ We have searched the record to find evidence of endangerment

or any statement on the record by the trial court that it found endangerment by clear and convincing evidence. We find neither. The evidence established only that Lindy might have used poor judgment in assessing the danger of sexual abuse by Dustin Drone. Nothing in the record amounts to proof of endangerment, in contradiction to the requirements of section 610. The court found the evidence "very close" on the standard of the best interest of the children, which falls far short of a finding of a proof of endangerment by clear and convincing evidence.

■ Not only did the trial court decide the case under an improper standard, it allowed the standard to change in the middle of the hearing, which put Lindy at an irreconcilable disadvantage. Before any evidence was submitted, both parties agreed that Jesse would have to prove endangerment by clear and convincing evidence. After Jesse put on his evidence, which fell short of proof of endangerment, his attorney argued that proof of endangerment was not necessary, citing the *Oehm* case. Evidently, the trial court erroneously agreed with Jesse's attorney. Based upon the lack of specific findings of endangerment, we find the order of December 12, 1996, to be void, and accordingly, we reverse and remand this case for further proceedings consistent with this opinion. We also find that Jesse's failure to prove endangerment and the trial court's improper shift in the burden of proof are two separate and additional bases upon which the order must be reversed.

Reversed and remanded.

KUEHN, P.J., and RARICK, J., concur.