(No. 84330.—

## THE DEPARTMENT OF PUBLIC AID *ex rel.* LINDY DAVIS, now by marriage, Lindy Eddy, Appellee, v. JESSE BREWER, Appellant.

*Opinion filed October 22, 1998.*

542

HEIPLE, J., joined by NICKELS, J., dissenting.

William E. Farr, of Pana, for appellant.

Frank B. Schweitzer, of Taylorville, for appellee.

JUSTICE McMORROW delivered the opinion of the court:

At issue in this appeal is whether, under section 610 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/610 (West 1996)), in order to modify a child custody judgment within two years of the judgment's entry, the circuit court must find child endangerment by clear and convincing evidence or whether the court need only find that there is "reason to believe" that the child's present environment may endanger him or her in some way. The appellate court held that the parent seeking modification had to prove child endangerment by clear and convincing evidence, and, on this basis, reversed the judgment of the circuit court of Christian County granting the father's petition for modification of custody. 292 Ill. App. 3d 416. For different reasons, we affirm the appellate court's judgment reversing the circuit court's order modifying custody.

BACKGROUND

Jesse Brewer and Lindy Davis, now Lindy Eddy, are the parents of two minor children: Tasia Lee Brewer-

Davis, born on April 26, 1991, and Nathan Silas Davis, born on July 30, 1992. Jesse and Lindy were not married at the time of either child's birth, and have never been married to each other. Lindy married Kevin Eddy in October 1994 and Jesse married Karen Poteet in May 1995.

On September 9, 1991, a consent order of parentage finding Jesse to be Tasia's natural father was entered by the circuit court of Fayette County. On September 30, 1994, the circuit court entered an agreed order establishing parentage, wherein Jesse acknowledged that he was Nathan's natural father. Shortly thereafter, on October 19, 1994, Jesse filed a petition for visitation privileges concerning both children. At a hearing on November 29, 1994, the parties reached an oral agreement regarding custody and visitation of the minor children, the terms of which were incorporated into a written stipulation. The trial court found the parties' agreement to be in the best interests of the children and approved the stipulation on December 2, 1994. This order placed sole custody of both children in Lindy, gave Jesse rights to visitation, and set a schedule for visitation between Jesse and the children. On January 5, 1995, the trial court approved a second written stipulation, and entered an order setting additional dates for visitation between the children and Jesse.

On November 21, 1995, the cause was transferred from Fayette County to Christian County, where both Jesse and Lindy were then residing. On December 15, 1995, Jesse filed a petition for modification of the custody and visitation order entered on December 2, 1994. According to the petition, material changes in the circumstances of the parties and children had occurred and the "environment at [Lindy's] house [had become] a serious danger to the minor children's physical, mental and emotional health." The central allegation in the petition

was that Lindy had "knowingly and continuously delivered the children to a babysitter whose environment was a danger to their physical and mental health," because the children had been subject to sexual abuse by the baby-sitter's teenage son. The petition also alleged that the children were in danger because Lindy had bitten Nathan's arm as a form of discipline. The petition requested that Jesse be awarded sole care and custody of the children. The record shows that the affidavit of Karen Poteet was attached to, and filed with, Jesse's petition for modification. In that affidavit, Karen related her discussions with the children and Lindy concerning the sexual abuse. On December 22, 1995, the trial court set Jesse's petition for an evidentiary hearing.

The trial court conducted an evidentiary hearing on Jesse's petition for modification during October and November 1996. On the first day of the hearing, Lindy's attorney argued that because Jesse's petition was filed and was being heard within two years of the December 2, 1994, custody order, pursuant to section 610 of the Act Jesse was required to establish, by clear and convincing evidence, that the present custodial arrangement seriously endangered the children. Jesse's attorney informed the trial court that he was "[d]efinitely in agreement" with that standard and was "prepared to proceed with that evidence."

During the hearing, Jesse presented evidence in support of the two allegations made in his petition: that Lindy bit Nathan's arm in an effort to discipline him; and that Lindy was aware that the children had been sexually abused at the home of the baby-sitter and failed to take appropriate action in protecting the children. Jesse additionally presented evidence concerning Lindy's alleged failure to have Tasia and Nathan immunized in a timely manner.

The testimony at the hearing established that during

visitation in June 1995, Jesse and his wife, Karen, discovered a bruise on Nathan's upper arm. Nathan informed them that Lindy had bitten him. Karen, who is a social worker and a mandated child abuse reporter, contacted the Department of Children and Family Services (DCFS). Lindy admitted during the hearing that she bit Nathan on one occasion, but testified that her actions were a last resort in an attempt to prevent Nathan from biting other children after several other disciplinary measures had proven unsuccessful. Lindy's testimony concerning Nathan's biting problem was corroborated by DCFS investigator Michael Parkin, who testified that Nathan told him that he bit others, and also by Karen, who testified that Nathan had previously bitten her on her upper leg. Lindy related that after she took this disciplinary measure, Nathan refrained from biting anyone else. The evidence showed that although DCFS investigated this incident, no formal action was taken against Lindy.

The trial court also heard undisputed evidence that Lindy failed to have the children immunized in accordance with the recommended immunization schedules. Although Lindy had received information regarding when the immunizations were to be administered, she failed to bring the children to scheduled appointments and neither child had been subject to a well-child examination. However, the evidence indicated that Lindy's failure in this regard amounted to tardiness and did not rise to the level of medical neglect. Further, both children had received the necessary immunizations at the time of the hearing.

The majority of the evidence at the hearing related to the sexual abuse of the children by the son of the children's baby-sitter. The evidence was not disputed that Dustin Drone sexually abused both Tasia and Nathan on at least one occasion sometime during the

summer of 1995. The critical dispute between the parties concerning this abuse was whether Lindy knew or should have known that the children had been subjected to sexual abuse and whether she properly protected the children from that abuse.

According to Lindy's testimony at the hearing, she had been friends with Dustin's mother, Nancy Drone, for most of Lindy's life. Further, Lindy and Jesse had lived with the Drones for some time before Tasia was born. For a period of approximately two years ending in July 1995, Nancy baby-sat the children while Lindy was at work.

Lindy testified that in May 1995, Tasia complained to her that her genital area hurt. Although Lindy found that Tasia's vaginal area was red and irritated, Lindy testified, she was not alarmed because Tasia was prone to infections in this area of her body. Lindy related that the irritation disappeared once she changed Tasia's soap and bubble bath.

Lindy testified that in late June 1995, she was informed by Nancy Drone that Tasia had been displaying inappropriate sexual behavior. Nancy described Tasia's conduct to Lindy. According to Lindy, Tasia, who was four years old at this time, had never before acted in such a manner. In addition, Nathan, who was almost three years of age at this time, also engaged in inappropriate sexual behavior. The next day Lindy met with Cheryl Woods, a counselor with the Shelby County mental health department, who instructed Lindy to report Tasia's behavior to DCFS. Lindy testified that DCFS declined to investigate on the basis that Lindy could not pinpoint the source of the children's behavior and that Tasia and Nathan refused to speak with anyone about it.

By the time Woods saw the children in early July 1995, their behavior had improved and they did not relate anything to her that indicated they were victims of sexual

abuse. Woods noted that Tasia did state that when the children stayed overnight with Jesse, both children slept in the same bed with Jesse and Karen. Based upon her interviews with the children, Woods concluded that they did not relate any high-risk factors and she believed that no further counseling sessions were required.

The testimony of both Woods and Lindy indicated that Lindy was concerned because the children's unusual behavior started after they had an extended visit with Jesse and Karen. As a result, Lindy went to an attorney in an attempt to have Jesse's visitation with the children stopped until Lindy "found out what was going on." However, because the attorney did not return Lindy's phone calls, Lindy did not pursue this avenue any further.

Lindy and her husband, Kevin, testified that at the end of July 1995, they were in the process of packing their belongings for their move to Pana, Illinois, when Tasia blurted out that she knew Dustin had French-kissed someone. After Tasia made this remark, Lindy asked Nancy Drone if Dustin, who was 16 years old at that time, was ever near the children. Nancy stated that Dustin was not around the children, as he was either in school or playing outside, and that the only time he was in the house was when he watched television. Nancy reassured Lindy that the children were never without Nancy's supervision. Lindy testified that she told Nancy to keep a very close watch on the children and their playmates in an effort to assist Lindy in discovering the source of the children's unusual behavior.

Based upon Nancy's statement that Dustin was never around the children, Lindy thought that it was not possible that Dustin had kissed Tasia. Lindy related that when she had been a teenager and Dustin was approximately 10 years old, she discovered that Dustin had been sexually molested. She further testified, however,

that she had forgotten this fact until she learned that Dustin had also molested her children. Lindy stated that Nancy baby-sat the children on only one or two occasions after Tasia made the statement about kissing, and that she ceased using Nancy as a baby-sitter because Nancy had become "unreliable" in that she was not home when Lindy arrived with the children for scheduled baby-sitting. Lindy testified that on a few occasions thereafter, the children were baby-sat by Teresa Boehm, who lives close to the Drone home and is Dustin's aunt.

Lindy stated that she was unaware that Dustin had sexually abused the children until she received a telephone call from a DCFS investigator on November 2, 1995. Lindy testified that DCFS personnel never made an in-person follow-up visit to her concerning this matter.

Jesse and his wife, Karen, related that during visitation in late October 1995, Tasia changed the subject of a conversation by spontaneously stating that it was "not fair" that Dustin told her she would be in trouble when he made her perform a sexual act. Nathan then uttered a similar remark. Karen immediately informed DCFS, and the children were interviewed by a DCFS investigator. Jesse and Karen informed Lindy neither of the statements made by the children, nor that the children had been interviewed by DCFS. Jesse and Karen testified that prior to this incident, the children had never made any similar statements or exhibited any behavior indicating that they had been sexually abused. Jesse and Karen also denied that the children slept in the same bed with them when the children stayed overnight at their home during visitation.

Karen testified that she received a telephone call from Lindy on November 2, 1995, after Lindy had been initially contacted by DCFS concerning the allegations of sexual abuse. Karen stated that during this conversation

Lindy told her that the children had been sexually acting out with other children and that Lindy had harbored suspicions concerning Dustin because Tasia had told Lindy that Dustin had French-kissed her on the mouth. According to Karen, Lindy also stated that Dustin had broken into homes to steal women's undergarments, had made 900-number telephone calls, and had been sexually molested as a child. According to Karen, Lindy stated that she had complained to Nancy about Dustin's behavior, and had taken the children to a counselor but that the children would not talk. Jesse testified that Lindy told him that she thought the kissing and sexual abuse might have occurred in May, June or July of 1995. According to Jesse, the primary reason he sought modification of the custody order was that he believed that although Lindy was aware that the children were sexually abused by Dustin, she allowed them to continue to be exposed to this threat.

Bert Holloway, a caseworker for DCFS, testified that he interviewed the children at Jesse and Karen's home on October 28, 1995, in connection with the children's statements concerning Dustin Drone. Holloway testified that both children stated that they had told Lindy about Dustin's actions, but Holloway was unable to establish exactly when the children informed Lindy. Holloway testified that he never interviewed Lindy in connection with the report of sexual abuse and there is no indication from the record that DCFS ever proceeded against Lindy on the basis of her alleged knowledge of this abuse.

Jo D. Spezia Lanham, a child protection investigator for DCFS, testified that she investigated the children's sexual abuse allegations and, as part of that investigation, contacted Lindy on one occasion by telephone on November 30, 1995. According to Lanham, Lindy told her that Nancy voiced concerns over Tasia's behavior in May 1995, and that Lindy requested Nancy to "keep an

extra eye on Tasia" because Tasia told Lindy that Dustin had French-kissed her.

At the close of Jesse's case, Lindy's attorney moved for judgment in her favor, contending that Jesse did not meet the agreed-upon burden of proving by clear and convincing evidence that the continued custody arrangement would seriously endanger the children. Jesse's attorney argued that the "standard is somewhat in dispute here," contending that section 610(a) of the Act should be interpreted as merely prefatory and that in order to modify a custody order, the court was required to find that Jesse had presented clear and convincing evidence of a change in circumstances and that it was in the children's best interests to modify custody. In support of his argument, Jesse's counsel cited the appellate court decision in *In re Marriage of Oehm*, 252 Ill. App. 3d 311 (1993). Although the trial court judge denied Lindy's motion, the judge did not specifically rule on the issue of the appropriate burden of proof.

On December 2, 1996, the trial court entered a memorandum of decision granting Jesse's petition to modify custody. The trial court judge determined that serious endangerment was "the initial burden that must be met by affidavit to even allow the petition to be heard. It was met." The judge ruled that the proper burden on Jesse during the evidentiary hearing was "to show by clear and convincing evidence that a change of circumstances has occurred and that a modification of custody is in the best interests of the children." The trial court judge determined that the sexual abuse constituted the pivotal change of circumstance since the entry of the custody order.

The trial court judge stated that "[t]he closer issue is whether modification is in the best interests of the children." The judge found that Lindy's biting of Nathan as a disciplinary measure and the lack of timely immuniza-

tions, while not excusable, were not, in and of themselves, sufficient for modification. According to the judge, "[t]he key issue is the matter of sexual abuse, what Lindy knew or should have known, and what, if anything she did about it. These are not easy questions to answer." The trial court judge found that although Lindy did not know the full extent of sexual abuse as it was occurring, "one must question Lindy's judgment and sensitivity to warning signs."

The trial court judge found that "due to Lindy's failure to protect the children from sexual abuse, though probably negligent and not intentional, the stability now present in Jesse's household with the presence of Karen Poteet, and to a lesser extent Lindy's failure to properly immunize the children, it is in the children's best interests that custody be transferred to Jesse." In further explanation, the trial court judge stated that "[i]n fairness to Lindy, it should be noted that this is a case upon which reasonable people might disagree," and that "[t]he issue of whether Jesse met his burden on the best interest standard [was] very close." The judge concluded, however, that "after balancing all the factors," the children were "better off with Jesse." The judge further ruled, however, that there was "no reason that Lindy should not have liberal visitation."

On December 5, 1996, Lindy filed with the trial court a motion to reconsider its grant of Jesse's petition to modify custody, arguing that the trial court judge's findings that this was a case "upon which reasonable people might disagree" and that the evidence was "very close" showed that Jesse failed to meet the clear and convincing standard of proof required pursuant to section 610 of the Act. On December 10, 1996, the trial court judge denied Lindy's motion to reconsider, explaining the basis of his grant of modification in a docket entry as follows: "To characterize this decision as being made with absolute

certainty would be unfair to Lindy Eddy. It was indeed close as judged by the clear and convincing evidence standard. However, the court still believes it to be the correct decision ***."

Lindy thereafter appealed. In reversing the trial court's ruling and remanding this cause for further proceedings, the appellate court held that the trial court incorrectly interpreted section 610 of the Act. According to the appellate court, because the custody order that Jesse sought to modify was entered within two years of the hearing, sections 610(a) and (b) of the Act required Jesse to prove by clear and convincing evidence that the current custodial arrangement seriously endangered the children. 292 Ill. App. 3d at 425. In reaching its conclusion, the appellate court rejected the interpretation of section 610 employed by the appellate court panel in *In re Marriage of Oehm*, 252 Ill. App. 3d 311 (1993), which was relied upon by the trial court. The appellate court determined that without clear and convincing proof of serious endangerment to the children and specific findings to that effect, the trial court's order modifying the custody judgment was void. 292 Ill. App. 3d at 427. Finally, the appellate court held that the trial court improperly allowed the legal standard to change in the middle of the hearing, placing Lindy at an "irreconcilable disadvantage." 292 Ill. App. 3d at 428.

We granted Jesse leave to appeal. 166 Ill. 2d R. 315. Before this court, Jesse raises two issues for consideration: (1) whether, under section 610 of the Act, in order to modify a child custody judgment within two years of the entry of that judgment, the circuit court must find child endangerment by clear and convincing evidence, or whether the court need only find that there is "reason to believe" that the child's present environment may endanger him or her in some way; and (2) whether sufficient evidence was presented to justify the trial court's

modification of the custody order pursuant to section 610 of the Act.

## ANALYSIS

The Illinois Parentage Act of 1984 provides that modification of custody judgments is governed by the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 45/16 (West 1996)). Section 610 of the Act (750 ILCS 5/610 (West 1996)) governs modification of custody awards and was modeled after section 409 of the Uniform Marriage and Divorce Act (see Ill. Ann. Stat., ch. 40, par. 610, Historical & Practice Notes, at 93 (Smith-Hurd 1980)), which was "designed to maximize finality (and thus assure continuity for the child) without jeopardizing the child's interest." Uniform Marriage and Divorce Act, 9A U.L.A. § 409, Comment, at 212 (West 1998). The underlying purpose of section 610 of the Act is to " 'seek to discourage continuing litigation involving children' " and prevent " 'ping pong' " litigation in custody disputes. Ill. Ann. Stat., ch. 40, par. 610(a), Historical & Practice Notes, at 94 (Smith-Hurd 1980). Section 610 of the Act provides, in pertinent part:

> "(a) Unless by stipulation of the parties, no motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health.
>
> (b) The court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian *** and that the modification is necessary to serve the best interest of the child. *** The court shall state in its decision specific findings of fact in support of its modification *** if either parent opposes the modification ***." 750 ILCS 5/610(a), (b) (West 1996).

The central question presented in this appeal is the proper interpretation of sections 610(a) and (b) of the Act as those sections apply to petitions for modification of custody filed and heard within two years of the entry of the last custody judgment. In construing statutes, the goal of the courts is to ascertain and give effect to the legislature's intent. *In re Marriage of Mitchell*, 181 Ill. 2d 169, 173 (1998). In order to ascertain the intent of the legislature, this court has steadfastly adhered to the principle that courts should first look to the statutory language as the best indication of the intent of the drafters. *Nottage v. Jeka*, 172 Ill. 2d 386, 392 (1996). If the language of the provision at issue is plain and unambiguous, it will be given effect without resorting to other aids of construction. *Mitchell*, 181 Ill. 2d at 173. We conduct *de novo* review when resolving an issue of statutory construction. *Lucas v. Lakin*, 175 Ill. 2d 166, 171 (1997).

Sections 610(a) and (b) of the Act establish a dual-step process for modification petitions filed and heard within two years of the last custody judgment. Section 610(a) empowers a trial court, under certain circumstances, to grant a hearing on the petition for modification, with the ultimate decision on modification to be made pursuant to the legal standards set forth in section 610(b).

Section 610(a) provides that absent agreement by the parties, "no motion to modify a custody judgment may be made earlier than 2 years after its date." However, under limited circumstances, the court "may" permit a motion for modification to be made "on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health." 720 ILCS 5/610(a) (West 1996). Thus, section 610(a) "provides a ' "safety valve" for emergency situations' where modification is otherwise prohibited." Ill. Ann. Stat., ch. 40, par. 610(a),

Historical & Practice Notes, at 94 (Smith-Hurd 1980). The plain language of subsection (a) allows the trial court, in its discretion, to permit a petition for modification to be heard in those situations where the court, based upon submitted affidavits, has a *"reason to believe"* (emphasis added) that the child is seriously endangered by the present custodial environment. This construction is wholly consistent with the stated purpose of subsection (a) to operate as a "safety valve" for emergency situations, allowing consideration of a petition for modification of child custody where a child's welfare is at serious risk. Subsection (a) thereby serves an important gatekeeping function, as only those cases which satisfy the initial procedural prerequisite contained in subsection (a) proceed to an evidentiary hearing conducted pursuant to the provisions of subsection (b).

Section 610(b) specifies the legal standards a court must use in determining whether to grant a petition for custody modification. The plain language of subsection (b) applies to *all* petitions, regardless of whether they are filed and heard before or after two years from the date of entry of the custody judgment. In order for any prior custody judgment to be modified, subsection (b) requires the court to find, *by clear and convincing evidence*, based upon facts that have arisen since the prior custody judgment or that were unknown to the court at the time of that judgment, that: (1) "a change has occurred in the circumstances of the child or his custodian"; and (2) that "the modification is necessary to serve the best interest of the child." 750 ILCS 5/610(b) (West 1996). Subsection (b) also requires the court to "state in its decision specific findings of fact in support of its modification *** if either parent opposes the modification." 750 ILCS 5/610(b) (West 1996).

Thus, the plain language of the statute is clear that, in cases where a modification of custody is sought within

two years of the entry of the previous custody judgment, subsection (a) requires the court to find that the affidavits submitted by the petitioning parent establish a "reason to believe" that the "child's present environment may endanger seriously his physical, mental, moral, or emotional health." If this procedural prerequisite is met, the case then proceeds to an evidentiary hearing where the trial court applies the legal standards contained in subsection (b) to determine whether the modification petition should be granted. Because the statute's plain language is clear, we need not consider other interpretive aids in order to ascertain legislative intent. *Paris v. Feder*, 179 Ill. 2d 173, 180 (1997).

The plain language of the statute supports the conclusion that the legislature did not intend for a parent seeking modification of a custody judgment within two years of the judgment's entry to prove serious endangerment by clear and convincing evidence. Rather, modifications may be made after clear and convincing proof has been presented that the best interests of the child require modification. Although stability in a child's life is an important goal, it would make little sense to provide a "safety valve" for emergency situations so strict as to defeat its very purpose. We note that this holding does not undermine the policy of custodial stability while promoting the best interests of the child. In addition, the policy goal of assuring continuity for the child and avoiding "ping pong" litigation in custody disputes is further satisfied by subsection (c) of section 610, which provides that "[a]ttorney fees and costs shall be assessed against a party seeking modification if the court finds that the modification action is vexatious and constitutes harassment." 750 ILCS 5/610(c) (West 1996). This provision provides a strong deterrent to those persons who would plan to seek custody modification solely as a form of harassment against the other parent.

In reaching the conclusion that a parent seeking modification of a child custody judgment within two years of the judgment's entry must prove serious endangerment by clear and convincing evidence, the appellate court relied upon several previous appellate court decisions interpreting section 610 of the Act in a similar manner. However, we do not consider these decisions persuasive. Section 610 was amended in 1987, leaving subsection (b) in its present version. 1987 Ill. Laws 3171 (Pub. Act 85—746, eff. September 23, 1987). By deleting a clause which had limited application of the legal standards contained within subsection (b) to modification petitions filed after the expiration of the two-year period, the legislature clarified that the standards provided in subsection (b) apply to *all* petitions for modification, regardless of when filed and heard. Every case cited by the appellate court in its opinion in this matter relies upon either pre-1987 versions of the statute or decisions rendered prior to 1987. We find that the appellate court's interpretation of sections 610(a) and (b) is contrary to the plain meaning of the Act, and that the trial court's interpretation of section 610 comported with the plain meaning of the statute's language.

We next review the trial court's ruling granting Jesse's petition for modification. Determining custody in a particular case is a matter which rests within the sound discretion of the trial court. *In re Custody of Sussenbach*, 108 Ill. 2d 489, 498 (1985). Because the trial court is in the best position to judge the credibility of the witnesses and determine the needs of the child, "the question for the reviewing court is whether the trial court's decision is contrary to the manifest weight of the evidence." *Sussenbach*, 108 Ill. 2d at 499.

In applying this standard to the facts in the matter at bar, we find that the trial court abused its discretion in granting Jesse's petition for modification. In his mem-

orandum of decision, the trial court judge correctly determined that the pivotal change in circumstances since the entry of the custody order was the sexual abuse of the children by Dustin Drone. The trial court judge then observed that "[t]he closer issue is whether modification is in the best interests of the children." The judge determined that the lack of timely immunizations and the biting incident were insufficient grounds for modification. In addition, the judge found that there was "no evidence" that the children were "in danger of mistreatment," and that there was "no question" that both Jesse and Lindy loved their children.

However, in focusing upon the sexual abuse suffered by the children, the trial court judge stated that "[o]ne must question Lindy's judgment and sensitivity to warning signs." The judge was "convince[d]" that, based upon the evidence presented in this matter, "Lindy did not take appropriate measures to protect the children from the sexual abuse that they suffered." The trial court judge therefore granted Jesse's petition for modification of custody, but also commented that "[i]n fairness to Lindy, it should be noted that this is a case upon which reasonable people might disagree."

We agree with the appellate court that the evidence adduced during the hearing on Jesse's petition for modification "established only that Lindy might have used poor judgment in assessing the danger of sexual abuse by Dustin Drone." 292 Ill. App. 3d at 428. Nowhere in his memorandum of decision does the trial court judge specifically find, as required by subsection (b) of section 610, that Jesse had proven, by clear and convincing evidence, that the modification of custody was "necessary" to serve the best interests of the children. 750 ILCS 5/610(b) (West 1996). To the contrary, the trial court judge noted that the evidence was "very close" on the issue of the best interest of the children, that this was a

case "upon which reasonable people might disagree," and that the children were "better off" with Jesse.

The evidence presented at the hearing showed that Lindy promptly took several steps to investigate the possible sexual abuse after the symptoms came to her attention. When Lindy became aware that both Tasia and Nathan were displaying inappropriate behavior, she contacted a mental health counselor, Cheryl Woods, and set up appointments for the children in an effort to discover the cause of their behavior. Woods testified that because the children's actions began after they had an extended visit with Jesse and Karen, and because the children stated that they slept in the same bed with Jesse and Karen during the visit, Lindy was "very concerned" about the children's behavior and "certainly confused" regarding the source of Tasia's and Nathan's actions. Woods engaged in a counseling session with the children, during which they did not relate anything to her which indicated they were victims of sexual abuse. Woods therefore determined that the children were not in need of further counseling. Lindy could have thereafter reasonably assumed that the children were not in any danger. Lindy also contacted DCFS in connection with this incident, and DCFS declined to investigate.

Further, once Tasia made the comments concerning Dustin and kissing, Lindy immediately confronted Nancy Drone, who assured Lindy that the children were not left alone with Dustin. Lindy thereafter attempted to enlist Nancy's assistance in helping her discover the source of the children's behavior. After gaining reassurance from Nancy that the children were not left unattended, and in light of the fact that Tasia's statement was not clear in terms of whether she was kissed by Dustin or had seen Dustin kiss someone else, Lindy could have reasonably believed that conditions at the Drone residence were not the cause of the children's behavior. Finally, DCFS took

no action against Lindy in connection with the incidents of sexual abuse. In sum, Jesse did not establish by clear and convincing evidence that modification of custody was necessary to serve the best interests of the children.

## CONCLUSION

For the foregoing reasons, we hold that the appellate court erred in interpreting section 610 of the Act as requiring the circuit court to find child endangerment by clear and convincing evidence in order to modify a child custody judgment within two years of that judgment's entry. However, for the reasons stated, we affirm the judgment of the appellate court reversing the circuit court's order granting Jesse's petition for modification of custody, but reverse that portion of the appellate court's judgment remanding the cause to the circuit court for further proceedings. The judgment of the circuit court is reversed.

*Appellate court judgment*
*affirmed in part and*
*reversed in part;*
*circuit court judgment reversed.*

JUSTICE HEIPLE, dissenting:

The majority correctly holds that a parent seeking modification of a child custody judgment within two years is not required to prove serious child endangerment by clear and convincing evidence. Section 610(a) of the Marriage and Dissolution of Marriage Act merely requires the court to make a threshold determination that "there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health" (750 ILCS 5/610(a) (West 1996)) before proceeding to an evidentiary hearing. Then, at such hearing, the petitioner must prove by clear and convincing evidence that "a change has occurred in the circumstances of the child or his custodian" and "modification

is necessary to serve the best interest of the child." 750 ILCS 5/610(b) (West 1996). However, the majority's decision to reverse the trial court's order modifying custody ignores the appropriate standard of review in child custody cases and usurps the role of the fact finder. Therefore, I respectfully dissent.

The trial court's memorandum of decision states,

"Jesse does not have to prove that there is reason to believe that the present environment seriously endangers the children's physical, mental, moral or emotional health. This is the initial burden that must be met by affidavit to even allow the petition to be heard. It was met. The burden on Jesse is to show by clear and convincing evidence that a change of circumstances has occurred and that a modification of custody is in the best interests of the children."

The trial court found "the sexual abuse, which may permanently change the children's lives, \*\*\* in and of itself constitutes a change of circumstances." The trial court then made the following findings regarding "whether modification is in the best interests of the children":

"There was little evidence of the character of Nancy Drone, the babysitter, at least until her unreliability became apparent at the conclusion of the babysitting relationship. Yet even if there was no reason to question Lindy's judgment in hiring her, she was aware that Dustin had been sexually abused as a child. This might not alert some people to a potential problem, but when Dustin's name was associated with french kissing the children, stronger measures should have been taken instead of merely telling Nancy Drone to watch Dustin. This, coupled with earlier, unexplained episodes of sexual behavior, convince the Court that Lindy did not take appropriate measures to protect the children from the sexual abuse that they suffered. Even after acquiring the knowledge of the french kissing, she continued to utilize Nancy Drone on at least a few occasions. \*\*\*

\* \* \*

The Court believes that due to Lindy's failure to protect

the children from sexual abuse, though probably negligent and not intentional, the stability now present in Jesse's household with the presence of Karen Poteet, and to a lesser extent Lindy's failure to properly immunize the children, *it is in the children's best interests that custody be transferred to Jesse.*" (Emphasis added.)

Based on these findings, the trial court transferred the custody of the children to Jesse and granted Lindy liberal visitation.

The majority asserts the trial court's memorandum of decision does not include the mandatory finding that modification of custody is "necessary" to serve the best interests of the children. 183 Ill. 2d at 558. To the contrary, the language in the trial court's memorandum of decision demonstrates beyond question that the court applied the correct standard. Nothing in this court's precedents indicates a trial court's findings on a petition for modification of custody are insufficient if they do not include the magic word "necessary." See *In re Marriage of Cotton*, 103 Ill. 2d 346, 356 (1984) (noting "[t]he guiding principle in child custody cases is the best interests of the child"). Moreover, this court has used the phrases "necessary to serve the best interests of the child" and "in the best interests of the child" synonymously. See, *e.g.*, *Cotton*, 103 Ill. 2d at 359 ("There was sufficient evidence to justify the trial court's view that Christy had been the victim of serious child abuse and that it was in the best interests of the child to modify the custody decree").

The majority's allusion to this purported defect in the trial court's findings masks the majority's true purpose in this case: to usurp the role of the trier of fact and replace the trial court's judgment with its own findings on the issue of custody. The majority correctly notes that the determination of custody is a matter which rests within the sound discretion of the trial court and may not be reversed unless it is contrary to the manifest

weight of the evidence. 183 Ill. 2d at 557-58, citing *In re Custody of Sussenbach*, 108 Ill. 2d 489, 498-99 (1985). To say that the majority only pays lip service to the proper standard of review in this case would be too generous. The majority recites the proper standard of review but then ignores it utterly in a flurry of appellate fact finding. Seizing on the trial court's comment that this was a close case in which " 'reasonable people might disagree,' " the majority concludes the evidence presented by Jesse " 'established only that Lindy might have used poor judgment' " in assessing the danger of sexual abuse posed by her former baby-sitter's teenage son. 183 Ill. 2d at 558. The last sentence in the majority's analysis is particularly telling. "In sum," the majority concludes, "Jesse did not establish by clear and convincing evidence that modification of custody was necessary to serve the best interests of the children." 183 Ill. 2d at 560. The problem with the majority's conclusion is the trial court did find that Jesse proved by clear and convincing evidence that modification was necessary. Thus, this court must defer to the trial court's findings unless they are against the manifest weight of the evidence. See *Sussenbach*, 108 Ill. 2d at 499; *In re Marriage of Fuesting*, 228 Ill. App. 3d 339, 344 (1992) (noting trial court is in best position to determine custody issues because it has heard the testimony of the witnesses and observed their demeanor).

The trial court's comment this was a close case "upon which reasonable people might disagree" was a candid admission concerning the difficulty in deciding child custody cases. About that, there can be no dispute. The majority, however, has chosen to ignore its function as a court of review and instead assumes the role of the trier of fact in order to make its own determination on the issue of custody. This decision undermines the deference traditionally accorded to trial courts on this issue, and,

in effect, amounts to *de novo* review on matters of fact at the appellate level. This is a new and unfortunate precedent for the orderly administration of justice. Accordingly, I dissent.

JUSTICE NICKELS joins in this dissent.